**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **CHARMAIN TAYLOR** | : |
| | : |
| **Plaintiff,** | : |
| | : |
| **v.** | : **Case No. 1:24-cv-01643 ABJ** |
| | : |
| | : |
| **TARIQUE ROBERTS, et al.** | : |
| | : |
| **Defendants.** | : |
| _____ | : |

<u>**PLAINTIFF CHARMAIN TAYLOR'S OPPOSITION TO
DEFENDANT TARIQUE ROBERTS' MOTION FOR SUMMARY JUDGMENT**</u>

**INTRODUCTION**

Plaintiff, Ms. Charmain Taylor, respectfully requests that this Court deny Defendant Tarique Roberts' Motion for Summary Judgment. There are numerous genuine issues of material fact that preclude summary judgment, and Defendant is not entitled to qualified immunity. The evidence, including the video footage, must be viewed in the light most favorable to Ms. Taylor. The entirety of Defendant Roberts's argument for summary judgment is premised on the idea that he had probable cause to arrest Ms. Taylor. However, when properly considered and viewed in the light most favorable to Ms. Taylor, the evidence shows that Defendant Roberts did not have probable cause to arrest Ms. Taylor and that the force he used was excessive and objectively unreasonable. Alternatively, if the Court does determine that Defendant Roberts is entitled to qualified immunity, the Court should decline to exercise supplemental jurisdiction over the common law claims because those claims present novel issues that the D.C. local court should resolve.

## STATEMENT OF FACTS

On the morning of August 23, 2023, Ms. Charmain Taylor was taking her young son to the Congress Heights Metro Station for his first week of school. As they approached the turnstiles, Ms. Taylor's son was unable to pass through because he did not have his SmarTrip card. Ms. Taylor, focused on ensuring that her son would not be late for school, became engaged in a brief discussion with Defendant Tarique Roberts of the Metro Transit Police Department, who was stationed nearby.

Defendant Robert began the conversation somewhat aggressively but when Defendant Roberts did not believe that his message was being properly received by Ms. Taylor, his tone began to escalate and he became more aggressive. During this exchange, Ms. Taylor expressed frustration at the situation, gesturing toward the turnstile and raising her voice in an effort to explain her son's need to get to school. Defendant Roberts continued to speak to Ms. Taylor in an elevated tone. Ms. Taylor, concerned for her son and the approaching train, continued to ask that her son be allowed through the turnstile. While agreeing that he would let the young child through the turnstile, Defendant Roberts continued to refuse to actually let the child go to school.

Throughout the ordeal, Ms. Taylor attempted to distance herself from Defendant Roberts and avoid having any contact or dealings with him. Ex. 3, 1:47 and 1:56. In one such instance, Ms. Taylor moved away from Defendant Roberts and the officer pursued and followed her aggressively. Frustrated by his actions, Ms. Taylor clenched her fist, put them down by her side and made an audible sound of her frustration. Ex. 3, 1:47. At the same time, in frustration, Ms. Taylor's body jutted towards Defendant Roberts.[1]

---

[1] The defendant argues that this constitutes an assault but notably, Defendant Roberts (or the other officer on the scene) did not attempt to arrest Ms. Taylor at this time. Nor could he have attempted to arrest Ms. Taylor, as she had violated no law. To the extent this action could even remotely be considered an assault by Ms. Taylor, it would have been done in self-defense and prior to Defendant Roberts having any probable cause to arrest Ms. Taylor.

Almost simultaneously, a bystander approached and offered to give Ms. Taylor's son a SmarTrip card, which allowed the child to pass through the turnstile. Ms. Taylor assisted her son in getting through the turnstile and once the child made it through, Ms. Taylor reached over the turnstile and handed the farecard to her son so as to allow him to exit upon reaching his destination.

Unbeknownst to Ms. Taylor and while her back was turned, Defendant Roberts had moved closer to her and all but blocked her in the turnstile galley. Ex. 3, 2:03-2:07. Upon handing the card to her child, Ms. Taylor turned to exit the station. At this point, Defendant Roberts was directly in Ms. Taylor's path. As she turned around, Ms. Taylor attempted to maneuver around Defendant Roberts, Ex. 3, 2:08-2:09, but Defendant Roberts had moved so close to her that it made avoiding contact difficult. For her part, Ms. Taylor does not remember whether any contact was made with Defendant Roberts and the video is not clear on that point. To the extent which there was any contact, the contact was minimal, unintentional, and only occurred (if at all) because Defendant Roberts had positioned himself in such a way that Ms. Taylor could not avoid him.

Not thinking much of any contact made, Ms. Taylor attempted to exit the station and get back to her car. Defendant Roberts pursued Ms. Taylor and escalated the situation by pushing Ms. Taylor against the railing and almost causing her to fall onto the train track. Ex. 3, 2:09. Even then, Ms. Taylor attempted to walk away and avoid any further confrontation with the officer. Ex. 3, 2:10-2:23. Defendant Roberts then deployed his pepper spray directly into her eyes. Ex. 3, 2:23-2:25. Ms. Taylor, in shock and pain, instinctively moved her hands toward her face to wipe the spray from her eyes. Ex. 3, 2:25. Ms. Taylor, still disoriented from the pepper spray, instinctively attempted to shield herself from further harm.

Throughout the incident, Ms. Taylor expressed confusion and fear Ex. 5, 4:20-4:25, repeatedly questioning why she was being detained. She made no threats or aggressive movements toward Defendant Roberts, aside from her verbal frustration about the situation. After being pepper-sprayed, Ms. Taylor's attempts to move her hands were a natural reaction to the pain in her eyes, not an attempt to resist arrest. Ex. 5, 2:10 ("I can't see"); 5:52. She yelled out "they're pulling my hair," and Defendant Roberts hand can be seen on Ms. Taylor's head. Ex. 5, 1:52, 1:57. She begged the officers for any kind of mercy. Ex. 5, 2:20-2:30. Defendant Roberts pressed the handcuffs into her wrist and twisted in such a way that it caused her to cry out in pain and her body began to visibly shake. Ex. 5, 4:30. Ms. Taylor cried to the officers "that hurts". Ex. 5, 5:15-5:18. She then asked if she could wipe her face, as the pain from the pepper was very intense. Ex. 5, 5:22. She told the officer that she would do whatever he wants. Ex. 5, 5:23-5:25. In response, the officers bent her arm again and caused her significant pain. Ex. 5:50-5:55. Ms. Taylor cried out again that the officer was still hurting her. Ex. 5, 6:11-6:20.

After Ms. Taylor was taken out of the station, Defendant Roberts asserted several times that the reason for Ms. Taylor's arrest was that she balled up her fist at Defendant Roberts. Ex. 5, 10:00-10:30, 15:39-15:41. It is unclear when he first mentioned her allegedly brushing against him as a separate basis for an assault. She says clearly "I never balled my fist up at you." Ex. 5, 10:30. As Ms. Taylor repeatedly told officers that her face was burning, it took nearly eight minutes for anyone to pour water on her face or otherwise give her relief.[2]

At no point did Ms. Taylor actively resist Defendant Roberts. The only resistance was passive in nature, as she struggled to understand why she was being forcibly detained and sought

---

[2] This failure to render aid constitutes to separate constitutional violation which plaintiff only became aware of by viewing the officer's body worn camera footage.

to protect herself from further harm. Despite this, Defendant Roberts continued to use physical force, resulting in Ms. Taylor's arrest.

Following the incident, no depositions were conducted, and no further evidence was gathered from potential witnesses, including a female Washington Metropolitan Area Transit Authority (WMATA) employee who had observed portions of the event. Multiple surveillance videos from the station capture the incident from various angles, but additional angles or footage from other parts of the station may exist. These gaps in the evidence remain unaddressed, as discovery has not been fully completed.

Ms. Taylor was charged with assault on a police officer and resisting arrest. She has consistently maintained that her actions were a response to Defendant Roberts' aggressive behavior and that she posed no threat during the incident. The United States Attorney's Office for the District of Columbia refused to levy charges against Ms. Taylor and declined to pursue a criminal matter against her.

## ARGUMENT

### I.     Legal Standard

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.  In applying this standard, the Court must "examine the facts in the record and all reasonable inferences derived therefrom in a light most favorable to the nonmoving party." *Robinson v. Pezzat*, 818 F.3d 1, 8 (D.C. Cir. 2016).

Defendant Roberts asserts that he is entitled to qualified immunity in this case because he had probable cause to arrest Ms. Taylor. The qualified immunity defense turns on (1) whether the defendants "violated a federal statutory or constitutional right," and (2) whether "the unlawfulness of their conduct was 'clearly established at the time.'" *District of Columbia v. Wesby*, 138 S.Ct. 577, 589 (2018). A right is clearly established when the "the state of the law [at the time] of the incident gave [the defendants] fair warning that their alleged [misconduct] . . . was unconstitutional." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). This rule does not require the proponent to identify "a case directly on point," *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011), but only that either controlling authority or "a robust consensus of cases of persuasive authority" placed the constitutional question beyond debate. *Wesby*, 138 S. Ct. at 589-90.[3]

Independently, qualified immunity must also be denied in the "'obvious case,' where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." *Id*. at 590 (quoting Brosseau v. Haugen, 543 U.S. 194, 199 (2004) (per curiam)); *accord Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 377 (2009)("[O]utrageous conduct obviously will be unconstitutional, this being the reason ... that the easiest cases don't even arise." (cleaned up)). The Supreme Court recently applied this principle to summarily reverse a grant of immunity because a lower court failed to recognize that the "particularly egregious facts" alone should have alerted any reasonable officer that the conduct at issue was unconstitutional. *Taylor v. Riojas*, 141 S.Ct. 52, 53–54 (2020).

## II. Application

### a. The Court Should Not Consider Officer Roberts' Explanation and Characterization of the Video Without First Allowing His Deposition and Discovery

---

[3] Defendant Roberts argues, but not fervently, that no precedent would have made him aware of that his behavior was illegal in this case and therefore, he is entitled to qualified immunity. However, the 4th Amendment makes clear that he could not arrest Ms. Taylor without probable cause.

At the outset, Ms. Taylor submits that the Court should not consider Defendant Roberts' explanation and characterization of the video evidence without first allowing his deposition and the completion of discovery. The Court, of course, can and should view all available videos. However, Defendant Roberts' motion for summary judgment heavily relies on his self-serving interpretation of the events captured in the video footage, including his statements regarding Ms. Taylor's alleged assault and resistance. These characterizations go beyond the objective evidence in the videos and inject subjective interpretations that require testing through the discovery process. Further, Defendant Roberts has been able to self select those videos which best suit his narrative without disclosing the remaining videos.

It is well-established that the "purpose of civil discovery to establish the fullest possible knowledge of the issues and facts before trial." *See* Advisory Committee Note on 1947 Amendments to Rule 26; *In re Kellogg Brown & Root, Inc.*, 796 F.3d 137, 144-45 (D.C. Cir. 2015)(citing *Societe Internationale Pour Participations Industrielles et Commerciales S.A. v. Brownell*, 225 F.2d 532, 541 (D.C.Cir.1955)(internal quotation marks omitted)). The purpose of discovery is to allow a broad search for facts, the names of witnesses, or any other matters which may aid a party in the preparation or presentation of his case. *Engl v. Aetna Life Ins. Co.* (C.C.A.2d, 1943) 139 F.(2d) 469; *Mahler v. Pennsylvania R. Co.* (E.D.N.Y. 1945) 8 Fed.Rules Serv. 33.351, Case 1. In this case, Officer Roberts' seeks to offer his interpretation of Ms. Taylor's actions and paint his own actions in the most favorable light, all while seeking to avoid the discovery process which would illuminate the truth surrounding both his and Ms. Taylor's actions. This includes his claims about her allegedly aggressive movements and resistance, which cannot be evaluated fairly without deposing him and exploring the full context of his actions and decisions on that day. If Defendant Roberts is seeking to have the Court consider

evidence outside of what is objectively on the videos, summary judgment is premature because the opposing party has not had an opportunity to obtain discovery that may reveal evidence necessary to justify opposition. *See Americable Intern., Inc. v. Department of Navy*, 129 F.3d 1271 (D.C. Cir. 1998)("[a]s we have stated before, summary judgment ordinarily is proper only after the plaintiff has been given adequate time for discovery."); *see First Chicago Int'l v. United Exch. Co.*, 836 F.2d 1375, 1380 (D.C.Cir.1988); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548 2552, 91 L.Ed.2d 265 (1986) (summary judgment appropriate only "after adequate time for discovery"); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257, 106 S.Ct. 2505 2514, 91 L.Ed.2d 202 (1986) (plaintiff must have "a full opportunity to conduct discovery.").  Allowing summary judgment at this stage would deny Ms. Taylor the opportunity to challenge Officer Roberts' version of events, including his motivations and the reasonableness of his actions, which are highly relevant to her claims of false arrest, excessive force, and other constitutional violations.  Moreover, the video footage, while important, does not capture every detail of the encounter. Other sources of evidence, such as bystander testimony, internal reports, and additional video angles, may provide a fuller picture of the events in question. Discovery is needed to gather this evidence and to challenge Officer Roberts' narrative. Courts have repeatedly held that pre-discovery motions for summary judgment are disfavored, especially where key factual issues are in dispute and where further evidence may shed light on the actions and motivations of the defendant. *See McWay v. LaHood*, 269 F.R.D. 35, 38 (D.D.C. 2010). Nonetheless, if the Court is inclined to consider Defendant Roberts's self-serving statements, Ms. Taylor would request that the Court defer any ruling on qualified immunity and narrowly tailor a discovery order to allow Ms. Taylor to rebut those points made by Defendant Roberts

that are outside of the videos.[4] *See Ziglar v. Abbasi*, 582 U.S. 120, 180-81 (2017)("where such a claim is filed, courts can, and should, tailor discovery orders so that they do not unnecessarily or improperly interfere with the official's work.").

For these reasons, fairness and judicial integrity require that the Court defer any ruling on summary judgment until Officer Roberts is deposed and Ms. Taylor is afforded the opportunity to engage in discovery. The Court should decline to consider Officer Roberts' explanations and subjective characterizations of the video without first allowing full and fair exploration of these issues through the discovery process.

**b. Defendant Roberts Lacked Probable Cause to Arrest Ms. Taylor**

Even upon considering Defendant Roberts's self serving, unscrutinized statement, the Court should still deny his motion for summary judgment. Defendant's arguments for summary judgment rest on the premise that Ms. Taylor assaulted him twice and therefore, he is entitled to qualified immunity. The first alleged assault occurring when Ms. Taylor clenched her fist in frustration.[5] The second alleged assault occurring when Ms. Taylor may have brushed against Defendant Roberts while attempting to leave the station. Neither of these occurrences constitute assaultive conduct by Ms. Taylor and therefore, there was never probable cause to arrest Ms. Taylor. Moreover, at a minimum, a genuine issue of material fact is created.

**c. Ms. Taylor's Frustrated Gesture Is Not an Assault**

Officer Roberts' contention that Ms. Taylor's clenched fist and simultaneous jutting motion constituted an "intent-to-frighten" assault is unsupported by both the facts and the law.

---

[4] Ideally, this order would include depositions of Ms. Taylor, Defendant Roberts, Officer Doe, and the other WMATA employees that can be seen on the video.
[5] "There are two distinct kinds of criminal assault recognized in the District of Columbia. The more common is the attempted-battery… The other is the intent-to-frighten type, which consists of some threatening conduct intended either to injure or to frighten the victim." *McGee v. United States*, 533 A.2d 1268, 1269 (D.C. 1987). Defendant Roberts argues that the first alleged assault was of the "intent-to-frighten" variety. There is no evidence of assault with respect to the first alleged assault.

For an intent-to-frighten assault, D.C. law requires that the plaintiff make an overt act intending to place the victim in reasonable apprehension of imminent harmful contact. *See Powell v. United States*, 238 A.3d 954, 958 (D.C. 2020); *United States v. Watts*, 798 F.3d 650 (2015)("[a]ssault is an intentional threatening gesture (such as pointing a gun at a person or trying but failing to strike him with one's fist) that does not, however, result in physical contact with the victim."). In this case, Ms. Taylor's actions—clenching her fist in frustration while raising her voice and simultaneously jutting forward towards Defendant Roberts—do not meet this legal threshold.

The video footage shows Ms. Taylor responding to a stressful situation as her son was delayed at the turnstile, and she was focused on ensuring that the child made it to school on time. Ms. Taylor was frustrated and angered at the situation but at no time did she assault Defendant Roberts. At no time during the incident, did Ms. Taylor attempt to strike or make any aggressive motion toward Officer Roberts. Her clenched fist, which were in fact directed away from the defendant and down by her side, and simultaneous jut forward were an instinctive gesture and expression of exasperation, not an attempt to cause apprehension of harm.

Courts have consistently held that mere words or gestures, without an accompanying overt act indicating an intent to harm, do not rise to the level of an assault. *See Powell v. United States*, 238 A.3d 954, 958 (D.C. 2020)(Court held evidence of intent-to-frighten assault insufficient when appellant advanced towards officers with fist balled.); *Cousart v. United States*, 144 A.3d 27, 32 n.11 (D.C. 2016)(mere words insufficient to establish intent to frighten assault); *State v. Ingram*, 237 N.C. 197, 74 S.E.2d 532 (N.C. 1953)(a mere look is insufficient to constitute an assault); *State v. Daniel*, 136 N.C. 571, 48 S.E. 544 (N.C. 1904)(offensive or insulting words insufficient to establish an assault).

In *Powell*, on facts significantly closer to assaultive conduct, the D.C. Court of Appeals held that the evidence in that case was insufficient to constitute an intent-to-frighten assault. In that case, the appellant kicked a police car and aggressively and angrily approached two officers and shouted vulgar language to the officers while reaching for something in her sock. One officer testified that the appellants fists were balled. That court reasoned that the appellant's actions in approaching the officers aggressively and shouting vulgar words and reaching in her sock, taken as a whole, could not be deemed as reasonably calculated to create fear in another person.

Here, similarly, Ms. Taylor's gesture of frustration can hardly be viewed as calculated to create fear in person.[6] Ms. Taylor's arms were down by her side and in no way positioned to threaten Defendant Roberts. Her simultaneous movement forward was merely an extension of her exasperation at the situation created by the defendant. Thus, as in *Powell*, Ms. Taylor's actions cannot create the basis for an assault.

Even if this Court views Ms. Taylor's actions that were borne out of frustration as constituting an assault, those actions would have been done in self defense. When the video is viewed in full context, the Court can see that Ms. Taylor on several occasions moved away from Defendant Taylor, including in the moments that preceded her clenching her fist and angrily placing them down by her side. Defendant Roberts aggressively and assertively pursued her without a basis to stop or arrest her at that time. Thus, Ms. Taylor would have been well within

---

[6] Almost all cases in the District of Columbia that have upheld an intent-to-frighten assault involve a weapon. *See Smith v. United States*, 601 A.2d 1080 (D.C. 1992)(pointing a gun); *Parks v. United States*, 627 A.2d 1 (D.C. 1993)(gun pulled from under seat); *Robinson v. United States*, 506 A.2d 572 (D.C. 1986)(gun); Snowden v. United States, 52 A.3d 858 (D.C. 2012)(moving towards victim with gun drawn); *Cousart v. United States*, 144 A.3d 27 (D.C. 2016)(knife); *Mihas v. United States*, 618 A.2d 197 (D.C. 1992)(knife); *Reid v. United States*, 581 A.2d 359 (D.C. 1990)(knife); Davis v. United States, 712 A.2d 482, 487 n.5 (D.C. 1998)(fire set); *Graure v. United States*, 18 A.3d 743 (D.C. 2011)(shooting a gun); *Jenkins v. Dist. of Columbia*, 223 A.3d 884 (D.C. 2020)(knife); *James v. United States*, 718 A.2d 1083 (D.C. 1998)(gunshots); *Washington v. United States*, 135 A.3d 325 (D.C. 2016)(imitation firearm pointed at victim).

her rights to move in a way that would suggest to Defendant Roberts that she would like to be free of his presence.

As such, Ms. Taylor's expression of frustration, without more, is not sufficient to meet the legal standard for assault and Defendant Roberts could not have had probable cause to arrest her following this gesticulation. Even if the gesture does constitute an assault, such an assault would have been committed in self-defense. Therefore, the notion that her frustrated gesture was a basis for probable cause is fundamentally flawed and creates, at a minimum, a genuine issue of material fact. Given the significant factual dispute over whether Ms. Taylor's gesture was intended to frighten Officer Roberts, summary judgment is not appropriate at this stage.

### d. The Second Alleged Assault Does Not Constitute an Assault and Any Contact was due to Defendant Roberts Placing Himself in Position to be Touched by Ms. Taylor

Ms. Taylor, for her part, does not recall if there was actual contact made between her and Defendant Roberts when she turned around from the turnstile and the video is unclear on that point. Even if we accept Defendant Roberts' statement as true that there was contact, any contact was brief, incidental, and unintentional. Officer Roberts also claims that Ms. Taylor's brief, incidental contact with him—where her shoulder may have brushed against his chest—constituted an assault on a police officer. This argument fails. The District of Columbia Court of Appeals has held that if there was no intent to make contact with a person, "the very essence of attempted-battery assault was lacking" *See Williams v. United States*, 887 A.2d 1000 (D.C. 2005).

The video evidence shows that Ms. Taylor was attempting to exit the station, and Officer Roberts positioned himself directly in her path while she was not looking, making it difficult or impossible for her to avoid contact. Further, the video shows that Ms. Taylor turned her shoulder to pass by Officer Roberts and attempted to avoid any contact with him. At that time, her

shoulder may have made slight contact with him, but this contact was *de minimis* and clearly unintentional.

The type of assault alleged in this second instance is attempted battery which "requires proof of an attempt to cause a physical injury." *McGee v. United States*, 533 A.2d 1268 (D.C. 1987). Any attempt must be done "with force or violence," *see Robinson v. United States*, 506 A.2d 572, 574 (D.C. 1986), and "[a] touch is inherently neither forceful nor violent within the common understanding (or even legal understanding) of those terms," *See Hernandez v. United States*, 207 A.3d 594, 600 (D.C. 2019)(internal footnotes and quotations omitted). Furthermore, courts have long held that incidental contact, especially when unavoidable or caused by an officer's positioning, does not constitute an assault. *See Atkins v. Twp. of Flint*, 94 Fed. Appx. 342, 349 (6th Cir.2004)(holding that the officer who initiated the altercation was not entitled to qualified immunity). In this case, any contact that occurred was minimal and entirely the result of Officer Roberts' deliberate movement into Ms. Taylor's path while her back was turned, which left her with no reasonable way to avoid him.

At a minimum, whether this incidental contact was sufficient to establish probable cause for an arrest raises a genuine issue of material fact that should be resolved by a jury. Officer Roberts' subjective interpretation of this contact as offensive or aggressive is not dispositive when the facts can reasonably be viewed differently. Since the video and facts surrounding this brief contact, if any, are open to multiple interpretations, summary judgment is not appropriate. The determination of whether this incidental brushing amounts to assault must be left to the trier of fact. Thus, Defendant Roberts is not entitled to qualified immunity and this Court should deny his motion for summary judgment.

### e. Any Resistance on Ms. Taylor's Part Was Passive at Best

Defendant Roberts argues that he and his partner did not exert excessive force because, according to Defendant Roberts, Ms. Taylor resisted his attempts to arrest her and his force was no more than was necessary to procure Ms. Taylor's detention.  Defendant Roberts further offers that Ms. Taylor's alleged resistance offered a separate basis for her arrest.[7]  The defendant's contentions are belied by the facts and the law.

At the outset, whether Defendant Roberts actions were objectively reasonable is question for the jury to be determined at trial after the development of the record through discovery.  *See Chapman v. Coates*, 119 F.2d 441, 442 73 App DC 270 (D.C. Cir. 1941); *Kuwait Airways Corp. v. American Sec. Bank, N.A.*, 890 F.2d 456 (D.C. Cir. 1989); *Oliver v. the Maryland Insurance Company*, 11 U.S. 487, 7 Cranch 487, 3 L.Ed. 414 (1813).

That said, DC courts distinguish between passive and active resistance, and to constitute resisting, a persons actions must go beyond passive resistance.  *See Campbell v. District of Columbia*, 245 F. Supp. 3d 78 (D.D.C. 2017). Therefore, passive resistance cannot serve as a basis for justifying the use of force.

Ms. Taylor's conduct can be separated into two phases: 1) prior to being pepper sprayed and 2) after being pepper sprayed.  Prior to being pepper sprayed, Ms. Taylor's actions—moving away from Officer Roberts and verbally expressing confusion—were natural responses to being unjustifiably detained.  At that time, Ms. Taylor was just walking away and was attempting to avoid Defendant Roberts.  Thus, at a minimum, prior to being pepper-sprayed, Ms. Taylor did not engage in any active resistance. She may have been bewildered and questioning why she was

---

[7] If the Court finds that Ms. Taylor's resistance did in fact offer a separate basis for her arrest, the Court should still find that Defendant Roberts' push of Ms. Taylor and pepper spraying her was excessive, in light of the fact that when he committed those acts Defendant Roberts lacked probable cause to detain Ms. Taylor.

being detained. Her movement was instinctual, attempting to shield herself from Officer Roberts' aggressive actions and merely consisted of walking or otherwise moving. This is consistent with the District of Columbia Court of Appeals holding in *In re C.L.D.*, 739 A.2d 353, 357 (D.C. 1999), which held "a person's conduct must go beyond speech and mere passive resistance or avoidance, and cross the line into active confrontation, obstruction or other action directed against an officer's performance in the line of duty." Thus, simply walking away from an officer does not constitute active resistance.

After being pepper sprayed, Ms. Taylor's struggle with the officer, borne out of fear for her own safety, should be seen in light of the fear and shock she experienced during the encounter. Ms. Taylor, a young woman, was suddenly confronted with two much larger male officers, who were aggressively attempting to arrest and subdue her without probable cause. Under these circumstances, it is entirely reasonable for Ms. Taylor to fear for her safety and instinctively try what she perceived as an unjust and threatening situation. Her actions were not violent—she did not hit, punch, or strike Officer Roberts. Instead, she primarily sought to shield herself and prevent further harm, as any reasonable person might when confronted with force under unjust circumstances. She was trying to avoid being forcibly taken from the scene and protect herself from the pain caused by the pepper spray and physical restraint. As she repeatedly stated on Defendant Roberts's body worn camera, she was scared and in fear. Her actions, therefore, were no more than a reasonable reaction of self-preservation in the face of overwhelming fear and physical intimidation.

Given these facts, Ms. Taylor's resistance cannot be considered active or aggressive. Her struggle was a natural response to an overwhelming situation in which she reasonably feared for her own safety. This passive resistance does not justify the level of force used by Officer Roberts

and cannot be used to excuse his actions. At a minimum a fact question exists as to whether her actions constituted active resistance or a reasonable act of self preservation. Furthermore, the characterization of Ms. Taylor's resistance as passive creates, at a minimum, a genuine issue of material fact, making summary judgment inappropriate.

### f. False Arrest

The claim for false arrest/false imprisonment should also proceed because Defendant Roberts lacked probable cause to arrest Ms. Taylor. Under D.C. law, false arrest occurs when someone is unlawfully detained without legal justification. *See Enders v. District of Columbia*, 4 A. 3d 457, 461 (D.C. 2010). Probable cause is the standard that justifies an arrest. *Id*. at 464. However, as previously established, Officer Roberts did not have probable cause to arrest Ms. Taylor for assault on a police officer or resisting arrest. Because there was no probable cause, Ms. Taylor's arrest was unlawful, and her false arrest/false imprisonment claims should proceed. Courts in this jurisdiction have consistently held that the absence of probable cause is dispositive in false arrest cases. *See Dellums v. Powell*, 566 F.2d 167 (D.C. Cir. 1977).

### g. Defendant Argues that the Court Should Dismiss the Intentional Infliction of Emotional Distress Claim because, According to Defendant He Had Probable Cause to Arrest and the Complaint Fails to Make a Prima Facie Case

First, Defendant Roberts did not have probable cause to arrest Ms. Taylor as discussed above. Second, the Court should decline to consider prima facie case argument, as it is unrelated to qualified immunity. Nonetheless, if the Court does consider the argument, Ms. Taylor has set forth the elements in her complaint and the Court should deny Defendant Roberts motion to dismiss on these grounds as well. Notably, Ms. Taylor's claim for intentional infliction of emotional distress (IIED) should survive summary judgment because Officer Roberts' conduct was extreme, outrageous, and intentionally designed to cause severe emotional distress.

The conduct here—pepper-spraying Ms. Taylor without cause, shoving her into a railing, and nearly causing her to fall over a wall onto the train tracks—was extreme and outrageous by any standard. These actions, taken together, go beyond what is acceptable in a civilized society, particularly given the disproportionate size and strength difference between Ms. Taylor and the officers involved. *Drejza v. Vaccaro*, 650 A.2d 1308, 1312 n. 10 (D.C.1994) (quoting RESTATEMENT, supra, § 46 comment h, and holding that the context of the behavior is important). The D.C. Court of Appeals has held that police conduct significantly less than what is alleged in this case can rise to the level necessary to sustain an intentional infliction of emotional distress claim where the officer's actions are so extreme and outrageous that they would shock the conscience. *See Dist. of Columbia v. Tulin,* 994 A.2d 788 (D.C. 2010)(holding that an officer that falsely told other police that the plaintiff was driving recklessly, leading to the plaintiff's arrest, could be held liable for IIED); see also *Carter v. District of Columbia,* 254 U.S.App.D.C. 71, 94, 795 F.2d 116, 139 (1986)(citing RESTATEMENT (SECOND) OF TORTS § 46, comment e (1965))( "Outrageous conduct may consist of '[the] abuse of [a] position of authority, particularly by, *inter alia,* police officers.'").

Defendant Roberts also argues that Ms. Taylor's emotional distress is insufficient to make a claim for IIED. However, the complaint, which the Court must take as true, states that Ms. Taylor suffers from post traumatic stress disorder. Courts have found PTSD to be sufficient to proceed with a IIED claim. *Soderlund v. Kuch*, 546 S.E.2d 632, 143 N.C. App. 361 (N.C. App. 2001); *Burgess v. Cnty. of San Diego*, 21-cv-616-MMA (MSB) (S.D. Cal. Dec 07, 2021); *Walters v. Mintec/Int'l*, 758 F.2d 73, 78 (3d Cir. 1985); *Sullivan v. Bos. Gas Co.*, 414 Mass. 129, 605 N.E.2d 805, 808-11 (1993); Sullivan, 605 N.E.2d at 806-07, 810 (finding that plaintiff with

PTSD and related symptoms could proceed to trial on NIED claim); *Sawyer Bros., Inc. v. Island Transporter, LLC*, 887 F.3d 23 (1st Cir. 2018). Therefore, this claim should proceed to trial.

**h. The Court Should Decline to Exercise Supplemental Jurisdiction Due to Novel and Complex Issues**

The Court should decline to exercise supplemental jurisdiction over the state law claims in this case because the issues raised are novel and complex, warranting adjudication by a local court familiar with D.C. law. Under 28 U.S.C. § 1367(c)(1), a court may decline to exercise supplemental jurisdiction if the state law claims raise novel or complex issues of state law. This case raises such issues, particularly concerning the rights of individuals allegedly resisting arrest without probable cause and the legal boundaries of excessive force in such situations. The case also raises issues concerning the intent required which the District of Columbia Court of Appeals has indicated that its cases can be unclear. *See Buchanan v. United States*, 32 A.3d 990, 998 (D.C. 2011)( "we have labeled assault a general intent crime, however, we have also articulated additional showings of intent which would seem to go above and beyond the ordinary conception of general intent merely to do the act constituting the assault."). Furthermore, the question of whether a woman who fears for her safety is legally obligated to acquiesce to an arrest that lacks probable cause presents a significant and unresolved issue under D.C. law. Moreover, whether Ms. Taylor's actions—given the circumstances and the power dynamics between her and Officer Roberts—cross the threshold from passive resistance to active resistance is a complex issue that should be fully explored in the local D.C. court. The nuances in determining whether Officer Roberts' conduct was objectively reasonable, and whether it constituted excessive force under D.C. law, further contribute to the complexity of this case.

Given these unresolved legal questions, this Court should decline to exercise supplemental jurisdiction and allow a local court to address the novel and complex state law

claims raised in this matter. *See Burney v. Suggs*, 630 F. Supp.3d 20, 34 (D.D.C. 2022) (explaining that courts may decline supplemental jurisdiction where complex issues of state law are present); *Cannon v. District of Columbia*, 783 F.3d 327 (D.C. Cir. 2015)(holding that the trial court has discretion over whether to exercise supplemental jurisdiction); *Lopez v. Smiley*, 375 F.Supp.2d 19, 25 (D. Conn. 2005); *Young v. New York City Transit Auth.*, 903 F.2d 146, 163–64 (2d Cir.1990)("[a]lthough the doctrine of pendent jurisdiction is one of flexibility and discretion, it is fundamental that '[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law.'"); (quoting *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966)). By allowing these claims to proceed in state court, the parties can benefit from the D.C. Superior Court's expertise in D.C. law, ensuring a more thorough and just resolution of the claims.

## CONCLUSION

This Court should deny Defendant Roberts's motion as neither Ms. Taylor's frustrated gesture nor the incidental contact, if any, with Officer Roberts constitute an assault and at a minimum such conduct raises significant factual disputes as to whether Ms. Taylor committed an assault. Because no assault was committed, Defendant Roberts lacked probable cause to arrest Ms. Taylor and any force used in effectuating an unlawful arrest was excessive. Thus, Defendant Roberts is not entitled to qualified immunity. If the Court does grant the motion for summary judgment on qualified immunity grounds, the Court should decline to exercise supplemental jurisdiction because the case presents novel issues.

Respectfully Submitted,

_____
Randy Evan McDonald, Esq.
1001 L Street, SE
Washington, DC 20003
(240)491-7609 (phone)
(301)710-0450 (fax)
Bar Number: 17656
randyemcdonald@gmail.com
Counsel for Defendant

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this <u>21st</u> day of <u>October</u>, 2024, a copy of the foregoing was electronically served on all counsel of record via this Court's CM/ECF e-filing system.

_____
Randy E. McDonald

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**CHARMAIN TAYLOR**                       :
                                          :
               **Plaintiff,**             :
                                          :
        **v.**                            : **Case No. 1:24-cv-01643 ABJ**
                                          :
                                          :
**TARIQUE ROBERTS, et al.**               :
                                          :
               **Defendants.**            :
_____       :

## <u>ORDER</u>

UPON CONSIDERATION of the defendant's motion for summary judgment and any plaintiff's opposition thereto;

Plaintiff's motion for extension of time is HEREBY DENIED.


_____
Judge Amy Berman Jackson
U.S. District Court for the District of Columbia