# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CHARMAIN TAYLOR,              ) | |
|                       ) | |
|         Plaintiff,        ) | |
|                       ) | |
|        v.             ) | Civil Action No. 24-1643 (ABJ) |
|                       ) | |
| TARIQUE ROBERTS, *et al.*,    ) | |
|                       ) | |
|         Defendants.     ) | |
|                       ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Charmain Taylor brought this action against two officers of the Metro Transit Police Department, Tarique Roberts and an unknown John Doe, alleging that they violated her rights under the Fourth Amendment during an altercation inside a Metrorail station. Compl. [Dkt. # 1-4] ¶¶ 1–3. The complaint consists of six causes of action: (1) a claim against both defendants under 42 U.S.C. § 1983 for excessive force and unlawful seizure; (2) a claim against Officer Doe for failure to intervene; (3) a claim against both defendants for assault; (4) a claim against both defendants for battery; (5) a claim against both defendants for false imprisonment and false arrest; and (6) a claim against both defendants for intentional infliction of emotional distress. Compl. ¶¶ 39–93.

Plaintiff filed her complaint in the Superior Court for the District of Columbia on April 15, 2024, and Officer Roberts removed it to this Court on June 5, 2024. Notice of Removal [Dkt. # 1] at 1–2. Officer Roberts answered the complaint, Answer [Dkt. # 4], and the parties submitted a joint report under Local Civil Rule 16.3 in which defendant proposed a schedule for summary judgment briefing to take place before discovery. Meet & Confer Statement [Dkt. # 5] at 4. The

Court held an initial scheduling conference on July 11, 2024 and, with the consent of the parties, it adopted the proposed schedule. Minute Entry (July 11, 2024); Minute Order (July 11, 2024).

Pending before the Court is Officer Roberts' motion for summary judgment, Def.'s Mot. for Summ. J. [Dkt. # 7] ("Mot."), which is supported by: a Statement of Undisputed Material Facts, Def. Roberts' Statement of Undisputed Material Facts [Dkt. # 7-3] ("DSUMF"); a sworn declaration from Officer Roberts, Decl. of Tarique Roberts, Ex. 4 to Mot. [Dkt. # 7-4]; three videos obtained from stationary surveillance cameras in the Metro station, *see* Ex. 3 to Mot. [Dkt. # 7-5] (surveillance camera – video only), Ex. 4 to Mot. [Dkt. # 7-6] (surveillance camera – video only), and Ex. 6 to Mot. [Dkt. # 7-8] (surveillance camera – video only); and the officer's body worn camera video, Ex. 5 to Mot. [Dkt. # 7-7] (Roberts' body worn camera – audio begins twenty-nine seconds into the clip provided). The defense also submitted an audio recording of plaintiff's interview with a Metro Transit Police investigator who was looking into her complaint. Ex. 7 to Mot. [Dkt. # 7-9]. The motion is fully briefed. Pl.'s Opp. to Mot. [Dkt. # 10] ("Opp."); Def.'s Reply to Opp. [Dkt. # 11] ("Reply").

For the reasons stated below, the motion is **GRANTED IN PART AND DENIED IN PART**. A few of the claims are flawed on their face and can be disposed of at this stage, but the fundamental issues in the case – was there probable cause to arrest the plaintiff? did the officers use excessive force? – are determinations that will benefit from further factual development before judgment can be entered as a matter of law.

2

## BACKGROUND

The incident at issue in this case occurred on August 23, 2023 at the Congress Heights Metrorail station.  DSUMF ¶ 7.[1]  That morning, Officer Roberts was assigned to monitor passengers at the station for compliance with fare requirements, DSUMF ¶ 7, and plaintiff was dropping her son off to take the Metro to school.  Compl. ¶ 12.

Just before 9:30 a.m., plaintiff and her son walked up to the turnstiles where passengers enter the Metro with a farecard or other method of payment.  Ex. 3 at 01:02–07.  Plaintiff hugged her son and watched as he walked up to the emergency swing gate to the left of the turnstiles and attempted to pass through.  Ex. 3 at 01:07–15; *see also* DSUMF ¶ 11 ("Plaintiff directed her child to pass through the closed emergency swing gate.").  The swing gate bore a sign with large red letters stating, "EMERGENCY EXIT ONLY AUTHORIZED USE ONLY VIOLATORS SUBJECT TO CITATION."  DSUMF ¶ 13, citing Ex. 5 at 00:47.  Officer Roberts can be seen standing a few steps behind plaintiff, on the public side of the turnstiles, wearing his "full [Metro Transit Police Department] uniform."  Ex. 3 at 01:15; DSUMF ¶ 8.

As plaintiff's son tried to open the emergency gate, Officer Roberts stepped forward to speak with plaintiff, "knowing that schools were starting again and wanting to take the opportunity

---

1    Pursuant to Local Civil Rule 7(h), Officer Roberts included "a statement of material facts as to which the moving party contends there is no genuine issue" with his summary judgment motion.  Rule 7(h) requires plaintiff to respond with "a separate concise statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated," but plaintiff, who is represented by counsel, failed to do so in connection with her opposition to the motion.  The Rule states that "the Court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion," Local Civ. R. 7(h), but it has the discretion to assess summary judgment in light of the entire record.  *Arrington v. United States*, 473 F.3d 329, 335 (D.C. Cir. 2006).  Therefore, while the Court will accept the uncontroverted factual statements in defendant's statement of undisputed material fact as true, it will consider the motion in light of all of the evidence submitted.

3

to inform [her] about the requirements" for students' use of the train.  DSUMF ¶ 14; Ex. 3 at 01:15–18.  The pair spoke for about ten seconds, during which Roberts "told plaintiff that he would let her child through the faregates without a [fare] card, but he wanted to first make sure she was aware of how to get" a "Kids Ride Free" card for future use.  Ex. 3 at 01:16–24; DSUMF ¶¶ 15–17.  But after the boy gave up on the emergency swing door, plaintiff made a gesture toward the gate, walked up to it, and tried to open it herself.  Ex. 3 at 01:25–31; *see* DSUMF ¶ 18 ("Plaintiff ignored Officer Roberts and after seeing her child was unsuccessful in opening the swing gate, she immediately walked away from Officer Roberts and tried to open the emergency swing gate herself.").  Officer Roberts followed her and continued speaking to her, Ex. 3 at 01:25–31, and she was unable to push the locked gate open.  At that point, the pair appear to be getting into a more heated discussion.  Ex. 3 at 01:31–41.  There is no sound on this portion of any video, but it is apparent from Exhibits 3, 4, and 5 that plaintiff was angry and arguing with the officer.  In a span of about ten seconds, plaintiff turned and took a step toward Roberts, and Roberts pointed at her and her son several times.  Ex. 3 at 01:31–41.

Plaintiff then directed her son toward the turnstiles and appeared to urge him to try to edge sideways through a small gap.  Ex. 3 at 01:41–44.  A second officer standing on the paid side of the gate stopped him, and plaintiff and Officer Roberts continued to argue.  Ex. 3 at 01:44–45.  Exhibit 4 depicts her plainly getting up into his face.  Ex. 4 at 01:34–35.

4



While plaintiff was yelling, she began gesturing with her arm and pointing towards the gate.  Ex. 4 at 01:40.

Growing more visibly frustrated, plaintiff took a step back from Officer Roberts and started gesturing with her arms, yelling, and pointing to the gate.  Ex. 3 at 01:45–52.  All of this was apparently audible in other parts of the station, because as this was going on, an unknown man in a white t-shirt can be seen approaching plaintiff and trying to get her attention.  Ex. 3 at 01:52–55.  While plaintiff looked towards the man, Officer Roberts stepped closer, and she responded by balling up her fists at her sides and leaning in towards Roberts, as seen below, still yelling.  Ex. 3 at 01:55–57; Ex. 5 at 00:25–27.  There is no audio in this portion of the video.





The man in the white t-shirt then passed between the two and handed plaintiff a fare card,

Ex. 3 at 01:58–02:00, which she accepted and promptly used to admit her son through the turnstile.

Ex. 3 at 02:00–05.[2]  After the boy exited to the other side, plaintiff reached over the gate to give him the card.  Ex. 3 at 02:05–06.

As plaintiff was reaching over, Officer Roberts stepped up to about two feet behind her. Ex. 3 at 02:05–06.  When she turned to walk away, she can be seen brushing up quite closely against Officer Roberts' torso as seen below, and pushing off with her elbow as she passes.  Ex. 3 at 02:07–08.



---

2       While the first twenty-nine seconds of the body warn camera video has no sound, audio recording began at timestamp 09:30:58 in the video.  Ex. 5 at 00:30.



At that point, Officer Roberts asked, "Did you just put your fists up to me?" and she responded by yelling something unintelligible.  Ex. 5 at 00:37–39.

The next sequence of events followed in quick succession.  One second after plaintiff came into contact with the officer's body, he pushed her away with both hands.  Ex. 3 at 02:08–09; Ex. 5 at 00:39–40.  The officer averred that the move was intended to "create distance between them" so that he could arrest her for assault on a police officer.  DSUMF ¶¶ 34–35.  The shove cannot be seen on Exhibit 4, but it is apparent from Exhibit 5 that plaintiff was directly in the officer's face when he pushed her backwards.  Ex. 5 at 00:38–40.  Exhibit 3 reflects that she was pushed towards a concrete barrier and briefly lost her balance.  Ex. 3 at 02:10–11.

Plaintiff quickly regained her balance and began to approach the officer while he pulled out his can of oleoresin capsicum spray ("pepper spray") and then his handcuffs.  Ex. 3 at 02:11–13; DSUMF ¶ 41.  Plaintiff started to back away toward the fare gates, while the officer began to repeat, "You're under arrest."  Ex. 5 at 00:43–46; Ex. 3 at 02:12–15.  As he approached and reached

for her hand, plaintiff yelled, "Bitch, I'm not," pulled her hand away from him, and began to walk toward the escalators that led to the exit of the station.  Ex. 3 at 02:16–18; Ex. 5 at 00:45–47.

Officer Roberts followed as plaintiff walked away from him and towards the escalators, repeatedly telling her that she was under arrest.  Ex. 3 at 02:16–24; Ex. 5 at 00:48–54.  Plaintiff yelled, "Don't touch me" twice as she walked away from him, and as she continued to yell, he sprayed her in the face with a short burst of pepper spray.  Ex. 5 at 00:48–54; Ex. 3 at 02:24. Plaintiff immediately started screaming loudly, clutching her face, and stumbling toward the escalator, while Roberts repeated, "You're under arrest," and "Get on the ground."  Ex. 5 at 00:54–01:12.

As plaintiff made her way toward the escalator, the second unnamed officer who had been on the paid side of the fare gates came to assist Officer Roberts.  Ex. 3 at 02:24–30; Ex. 5 at 01:00–11.  The second officer attempted to grab plaintiff's wrist, but she pulled away to try to go up the moving stairs.  Ex. 5 at 01:11–15.  Both officers got a grip on plaintiff's wrists at the bottom of the escalator, while she screamed, "I can't see, please," and tried to pull away.  Ex. 5 at 01:15–23. After approximately fifteen seconds, both officers got plaintiff off the escalator and put her on the ground in a sitting position.  Ex. 5 at 01:15–30.

While seated, plaintiff continued to struggle as Officer Roberts attempted to put a handcuff on her right wrist.  Ex. 5 at 01:30–38.  He was unable to do that, but managed to handcuff the left wrist, and both officers continued to struggle with plaintiff as a bystander came up and asked what they were doing.  Ex. 5 at 01:35–48.  One of the officers told the bystander to stay back, and they continued to try to get plaintiff to put her handcuffed wrist behind her back so that they could cuff the other wrist.  Ex. 5 at 01:44–55.  The second officer started to repeat, "Stop resisting."  Ex. 5 at 01:51.

Standing behind plaintiff, Officer Roberts grabbed the back of her headscarf and repeated, "Give me your hand," for about five seconds, until she shouted, "Quit pulling my hair," and he let go.  Ex. 5 at 01:55–2:00.[3]

Plaintiff started repeating, "Please," and "I can't see," and after about twenty more seconds, the officers were able to roll her onto her side and then her back.  Ex. 5 at 02:00–2:21.  She was not more subdued at that point either.  Officer Roberts instructed plaintiff, "Stomach on the ground," multiple times,  Ex. 5 at 02:21, and she continued to yell, "Please."  Ex. 5 at 02:21–46.  Defendant then pushed his knee into plaintiff's side, and repeated, "Put your stomach on the ground."  Ex. 5 at 02:51–03:40.

After about another minute of struggling to handcuff plaintiff, Officer Roberts told her that they would spray her again, and she put her free hand up to block her face.  Ex. 5 at 03:43–48. The second officer then asked plaintiff her name, and she responded that it was Charmain, as Officer Roberts continued to yell, "Stomach on the ground."  Ex. 5 at 03:51–55.  The second officer tried to coax her to stand up, and she screamed, "Why do you want to spray me?" and "You know what happened sir, you seen everything."  Ex. 5 at 03:55–04:16.  Plaintiff gradually began to allow herself to be raised to a standing position, but as Officer Roberts pulled her arm up, she started screaming, "He's trying to break my arm," and she pulled back down to the ground.  Ex. 5 at 04:22–24.  She then started screaming and shaking on the ground, and asked "Why are you doing this to me?"  Ex. 5 at 04:28–50.

---

3      While the complaint alleges that plaintiff was choked, Compl. ¶ 31, there is no evidence to corroborate that on the video, and plaintiff did not report that in her interview.  *See* Ex. 7.

The two officers were then able to get plaintiff to her feet and up against a wall, as she screamed, "Ouch," multiple times, and Officer Roberts stated, "You're resisting." Ex. 5 at 04:55–05:18. Struggling against the wall, plaintiff said, "I can't see. Can you at least – can I wipe my face first, and then I will do whatever you – I will do whatever he want." Ex. 5 at 05:18–27. She then dropped to the ground again yelling, "Ouch," "Please let it go," and "I can't bend my arm that way." Ex. 5 at 05:34–55. Officer Roberts said, "This is all on camera," and repeated, "You're resisting." Ex. 5 at 06:00–05.

The second officer then asked plaintiff to stand up, and they pulled her up on her feet again. Ex. 5 at 06:06–10. While standing, the second officer said to her calmly, "Let me try to get you some help," and she responded, "Can you help me?" Ex. 5 at 06:14–18. He then directed her hands behind her back, saying, "I got you," and Officer Roberts finally handcuffed her other wrist. Ex. 5 at 06:19–26. They then ascended the escalator, Ex. 5 at 06:33, and plaintiff received medical attention in the parking lot outside the Metro station. DSUMF ¶¶ 53–54. Plaintiff declined immediate treatment beyond Tylenol after she was transported to United Medical Center. Ex. 8 to Mot. [Dkt. # 7-10] at 1.

Plaintiff was arrested for assault on a police officer and resisting arrest, DSUMF ¶ 59, but the charges against her were "no papered." Compl. ¶ 37.

## STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,

11

which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). To defeat summary judgment, the non-moving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted).

The mere existence of a factual dispute is insufficient to preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A dispute is "genuine" only if a reasonable fact-finder could find for the non-moving party; a fact is "material" only if it is capable of affecting the outcome of the litigation. *Id.* at 248; *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987). In assessing a party's motion, the court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the summary judgment motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alterations omitted), quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam).

## ANALYSIS

### I.      Portions of plaintiff's section 1983 claim will survive summary judgment.

Count One of the complaint asserts a claim under 42 U.S.C. § 1983 against both defendants. Compl. ¶¶ 39–64. Section 1983 creates a private cause of action for damages against a person who violates an individual's constitutional rights while acting "under color of any statute, ordinance, regulation, custom, or usage, of any State . . . or the District of Columbia." 42 U.S.C. § 1983. Plaintiff alleges that defendants violated her rights under the Fourth Amendment by unlawfully arresting her and using excessive force. Compl. ¶¶ 49–50.

Officer Roberts has raised the defense of qualified immunity to the claims of unlawful arrest and excessive force. Mot. at 8. The doctrine of qualified immunity shields officials from civil liability under section 1983 "so long as their conduct does not violate clearly established

12

statutory or constitutional rights of which a reasonable person would have known." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015), quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted). The purpose of qualified immunity is to protect officials "from undue interference with their duties and from potentially disabling threats of liability" in civil damages actions. *Harlow v. Fitzgerald*, 457 U.S. 800, 806 (1982).

"[O]fficers are entitled to qualified immunity . . . unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time." *District of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018) (internal quotation marks omitted). At summary judgment, there are two prongs of the analysis: (1) whether, taken in the light most favorable to the party asserting the injury, the facts show the officer's conduct violated a constitutional right; and (2) whether the right was clearly established in light of the specific context of the case. *Scott*, 550 U.S. at 377. The court has discretion to decide which question to address first, *Pearson*, 555 U.S. at 236, and the defendant bears the burden of pleading and proving qualified immunity. *Harlow*, 457 U.S. at 812.

Because deciding whether an officer is entitled to qualified immunity for unlawful seizure and excessive force involves two distinct legal frameworks, the Court will analyze each as a separate claim.

**A. The Court will deny defendant's motion for summary judgment on the question of whether the arrest for assault on a police officer was unlawful, but it will grant summary judgment in favor of defendant on the question of whether there was probable cause to arrest plaintiff for resisting arrest.**

For the claim alleging an unconstitutional arrest, Officer Roberts maintains that the video establishes that he had probable cause to arrest plaintiff first for assaulting a police officer, and then for resisting arrest, and that even if he was wrong about probable cause, "he is still entitled to

13

qualified immunity because there is no clearly established law that would have provided him notice that his actions were unlawful." Mot. at 8.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "[A]n arrest is a 'seizure' of a 'person' within the meaning of the Fourth Amendment," and a seizure "conducted outside the judicial process, without prior approval by a judge or magistrate, [is] *per se* unreasonable" unless it falls into one of a "few . . . well delineated exceptions." *Lin v. District of Columbia*, 47 F.4th 828, 839 (D.C. Cir. 2022), quoting *Minnesota v. Dickerson*, 508 U.S. 366, 372 (1993) (internal quotation marks omitted). One of the exceptions "allows warrantless arrest if the officer has probable cause to believe that a criminal offense has been or is being committed." *Id.*, quoting *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004) (internal quotation marks omitted).

To determine whether an officer had probable cause for an arrest, courts look to "the events leading up to the arrest" and "whether these . . . facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *Wesby*, 583 U.S. at 56–57, quoting *Maryland v. Pringle*, 540 U.S. 336, 371 (2003) (internal quotation marks omitted). The existence of probable cause is based on "the totality of the circumstances," *id*. at 57, and it is measured as of "the moment the arrest was made." *McGovern v. Brown*, 891 F.3d 402, 405 (D.C. Cir. 2018), quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964) (internal quotation marks omitted). While probable cause is "a fluid concept," it "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Wesby*, 583 U.S. at 57, quoting *Illinois v. Gates*, 462 U.S. 213, 232, 243–44 n.13 (1983) (internal quotation marks omitted); *see Lin*, 47 F.4th at 839–40 ("Probable cause requires more than bare suspicion, but less than a preponderance of the

14

evidence.") (internal quotation marks omitted). "It is enough that probable cause exists to arrest for *any* crime, not necessarily for the crime the officer[] had in mind at the time of the arrest." *McGovern*, 891 F.3d at 405 (emphasis in original).

Officer Roberts contends that he had probable cause to arrest plaintiff for assault on a police officer under D.C. Code § 22-405(b), and for resisting arrest under D.C. Code § 22-405.01. Mot. at 10. Those are distinct inquiries as well.

For assault on a police officer, the Court will deny summary judgment in defendant's favor at this time because, viewing the videos in the light most favorable to plaintiff, there is a genuine dispute of material fact over whether defendant had probable cause to arrest her.

The D.C. statute prohibiting assault on a police officer provides, "Whoever without justifiable and excusable cause assaults a law enforcement officer on account of, or while that law enforcement officer is engaged in the performance of his or her official duties shall be guilty of a misdemeanor. . . ." D.C. Code § 22-405(b). "Despite that broad wording, District of Columbia law does 'not criminalize every refusal to submit to a police officer or every prevention or hindrance of an officer in his duties.'" *Lin*, 47 F.4th at 843, quoting *Ruffin v. United States*, 76 A.3d 845, 850 (D.C. 2013). "'[A] person's conduct must go beyond speech and mere passive resistance or avoidance, and cross the line into active confrontation, obstruction or other action directed against an officer's performance in the line of duty by actively interposing some obstacle that precluded the officer from questioning him or attempting to arrest him.'" *Id.*, quoting *Ruffin*, 76 A.3d at 845. "'[T]he key to establishing any violation of' the statute is the existence of 'active and oppositional' conduct undertaken 'for the purpose of thwarting a police officer in his or her duties.'" *Id.*, quoting *Ruffin*, 76 A.3d at 845.

Plaintiff certainly appears to have been argumentative and oppositional when the officer was insisting that she listen to his instructions concerning student access to the Metro at a time when, as she tells it, she was already extremely concerned about her child making his train that morning. *See* DSUMF ¶¶ 15, 17, citing Roberts Declaration ¶¶ 15, 17; Ex. 7 at 01:21–02:07 ("He had stopped me and said my son couldn't go, he asked me where's his fare card?  And I said he doesn't have one, school just started, he hasn't received one. . . .  He said, well I'mma go ahead and let you go, I'mma let him go.  I said, okay, so I told my son to go ahead.  He stopped him, he said, no he can't go yet, you need to understand the protocols.  And I said, well, the train is approaching sir, and he has to be at school, he's already late, this is around 9:15 . . . .").  But a fair determination of whether her loud protestations, the balling of her fists, and what appears to be her physical contact with the officer as she presses past him rise to the level of a violation of the D.C. Code will depend upon an assessment of *all* of the circumstances, including what she was yelling at the time.  The record does not yet contain any information from the unnamed officer, and neither Officer Roberts nor plaintiff – both of whom speak in conclusory terms in their pleadings – has been deposed.  So it is unclear whether plaintiff was simply mouthy and obnoxious or whether she was threatening and/or impeding or interfering with the officer's performance of his duties.  Given that, the Court finds it premature to grant summary judgment on whether there was probable cause to arrest plaintiff, and the motion on that point will be denied without prejudice.

As to the portion of the claim challenging plaintiff's arrest for resisting arrest, the Court will grant summary judgment in favor of Officer Roberts on that issue since there can be no genuine dispute that plaintiff intentionally and actively resisted the effort to detain her.

 The statute that prohibits resisting arrest states, "[w]hoever without justifiable and excusable cause intentionally resists an arrest by an individual who he or she has reason to believe

16

is a law enforcement officer or prevents that individual from making or attempting to make an arrest of or detain another person shall be guilty of a misdemeanor." D.C. Code § 22-405.01(b).

Plaintiff takes the position that there is a genuine dispute of material fact on this issue because she "did not engage in any active resistance," Opp. at 14, but the videos contradict that assertion. After Officer Roberts pushed plaintiff away, he told her multiple times, "You are under arrest," while approaching her with handcuffs. Ex. 5 at 00:44–46; Ex. 3 at 02:12–16. As he reached for her arm to put her in the handcuffs, she pulled back and maneuvered around him to walk toward the exit of the metro station, yelling, "Bitch, I'm not," and "Don't touch me." Ex. 5 at 00:46–52; Ex. 3 at 02:17–22. Notably, all of that took place *before* the use of pepper spray, and plaintiff has not identified evidence to place those facts in dispute.

After Officer Roberts utilized the pepper spray, he repeated, "You're under arrest" and, "Get on the ground," and she again pulled away when the second officer attempted to get a grip on her wrist. Ex. 6 at 02:39–42; Ex. 5 at 01:11–13. It took several minutes to finally secure her in handcuffs as she continued to put up a fight. Ex. 5 at 01:28–06:10. In short, the videos were accurately summarized in paragraph 73 of Defendant's Statement of Undisputed Material Facts:

> Plaintiff refused to obey Roberts' commands after he informed her that she was under arrest and instead, actively struggled against him when he attempted to handcuff her by pulling her arms away, using her legs as leverage to keep the two officers from turning Plaintiff on her stomach to handcuff her, and kicking out her legs during the handcuffing process . . . .

DSUMF ¶ 73. If that is not resisting arrest, what is?

The Court is permitted to "'view [ ] the facts in the light depicted by' the video record," *Lash v. Lemke*, 786 F.3d 1, 6 (D.C. Cir. 2015) (alteration in original), quoting *Scott*, 550 U.S. at 381, and here, it establishes that Officer Roberts had probable cause to arrest plaintiff for resisting arrest based on her undisputed actions. Therefore, the Court will grant summary judgment in favor

of defendant on that portion of Count One claiming that plaintiff was unlawfully seized for resisting arrest under D.C. Code § 22-405.01.

### B. On the question of excessive force, the Court will deny summary judgment in favor of defendant at this point.

Plaintiff claims that Officer Roberts used excessive force against her by pushing her against the Metro railing, pepper-spraying her, pulling her to the ground by her hair, twisting her arm, placing his knee in her stomach, "slamming his knee into her side," and attempting to choke her. Compl. ¶¶ 51, 72, 77; Opp. at 3–4, 14 n.7.  Some of this appears on the video, but one cannot see an attempt to choke plaintiff or plaintiff being pulled down by her hair, and one can quibble with the use of the verb "slamming," although it is true that the officer uses his knee to try to get plaintiff to remain in one place.

"The Fourth Amendment's prohibition on unreasonable seizures extends to an officer's use of excessive force to conduct an arrest." *Hedgpeth v. Rahim*, 893 F.3d 802, 809 (D.C. Cir. 2018). Excessive force is analyzed under the "objective reasonableness standard," *Hall v. District of Columbia*, 867 F.3d 138, 157 (D.C. Cir. 2017) (internal quotation marks omitted), asking "whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them." *Lin*, 47 F.4th at 846, quoting *Lombardo v. City of St. Louis*, 594 U.S. 464, 466 (2021) (internal quotation marks omitted).

"An officer may use some degree of physical coercion or threat to arrest a suspect," and "not every push or shove, even if it may later seem unnecessary, violates the Fourth Amendment." *Hedgpeth*, 893 F.3d at 809, quoting *Oberwetter v. Hilliard*, 639 F.3d 545, 555 (D.C. Cir. 2011) (internal quotation marks and alterations omitted).  And the D.C. Circuit has explained that in excessive force cases:

18

> [A] defendant's motion for summary judgment is to be denied only when, viewing the facts in the record and all reasonable inferences derived therefrom in the light most favorable to the plaintiff, a reasonable jury could conclude that the excessiveness of the force is so apparent that no reasonable officer could have believed in the lawfulness of his actions.

*DeGraff v. District of Columbia*, 120 F.3d 298, 302 (D.C. Cir. 1997), quoting *Wardlaw v. Pickett*, 1 F.3d 1297, 1303 (D.C. Cir. 1993); *see McGovern*, 891 F.3d at 406 ("Taking the facts in the light depicted by the videotape, . . . the use of force was not so excessive that no reasonable officer could have believed in the lawfulness of his actions.") (internal quotation marks omitted). Still, "[a]n officer's act of violence violates the . . . prohibition against unreasonable seizures if it furthers no governmental interest, such as apprehending a suspect or protecting an officer or the public," so "a police officer must have some justification for the quantum of the force he uses." *Johnson v. District of Columbia*, 528 F.3d 969, 976–77 (D.C. Cir. 2008).

Courts pay "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Hedgpeth*, 893 F.3d at 809, quoting *Kisela v. Hughes*, 584 U.S. 100, 103 (2018). Relevant factors also include: "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Lin*, 47 F.4th at 846, quoting *Lombardo*, 594 U.S. at 467 (internal quotation marks omitted).

These factors tend to point in different directions here. First of all, plaintiff did not appear to be armed. And, as noted above, it is not clear what plaintiff said to the extent her words would bear on whether she reasonably appeared to pose a threat at the moment the officer pushed her

19

away.  However, the videos also show that at certain points in the encounter, she was actively resisting and attempting to evade arrest, and there is no evidence that she was injured in any way. Therefore, since the Court is required to resolve inferences in favor of the non-moving party, it makes sense to defer this portion of the summary judgment analysis in the Court's discretion until the record is more complete.

To begin chronologically, there is a genuine dispute of material fact as to whether defendant's act of pushing plaintiff constituted excessive force.  Officer Roberts contends that he pushed plaintiff away from himself "immediately after she made offensive contact by bumping against him, because he considered her actions a threat and because he was trained to create physical distance to assess danger."  Reply at 12.  But there is a factual dispute over whether that contact – even when combined with the balling of the fists – was assaultive in the first place.  And the push takes on a different character depending on which video it appears on, so this issue will benefit from further development of the factual record on full set of circumstances underlying the assault charge.

As to the officer's use of pepper spray and the actions he then took to subdue and handcuff the uncooperative plaintiff, the Court will also decline to grant summary judgment on this record alone.  But plaintiff should take careful note that she has a high hurdle to overcome given the indisputable evidence of her loud, disrespectful, and active resistance, her attempts to flee the scene, and the officer's choice of a non-lethal means to temporarily subdue her.  And even if it is ultimately determined that at that close range, the use of pepper spray – or any other move undertaken after plaintiff was affected by the spray – was ill-advised or exceeded what was reasonable under the circumstances, it is not clear that the Court or a jury would find the officer's

20

actions to be so excessive that no reasonable officer could have believed they were lawful. Moreover, it is not clear what damages she would be able to establish at the end of the day.

**II.     The common law claims for false imprisonment, assault, and battery will survive summary judgment at this point, but the Court will grant summary judgment in favor of defendant on the claim for intentional infliction of emotional distress.**

Because plaintiff's common law claims arise out of the same facts as her constitutional claims, and their resolution requires no novel or complex issues of state law, the Court will exercise supplemental jurisdiction over them under 28 U.S.C. § 1367. *See id*. § 1367(a) ("[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III . . . .").

**A.  Assault and battery**

In the District of Columbia, "assault is an intentional attempt or threat, either by words or by acts, to do physical harm" to another, and "battery is an intentional act that causes harmful or offensive bodily contact." *Evans-Reid v. District of Columbia*, 930 A.2d 930, 937 (D.C. 2007) (internal quotation marks omitted). For both claims, "[a] police officer has a qualified privilege to use reasonable force to effect arrest, provided that the means employed are not 'in excess of those which the actor reasonably believes to be necessary.'" *Etheredge v. District of Columbia,* 635 A.2d 908, 916 (D.C. 1993), quoting *Jackson v. District of Columbia*, 412 A.2d 948, 956 (D.C. 1979). Like the excessive force claim under the Fourth Amendment, the reasonableness of an officer's use of force for the purposes of assault and battery "must be judged from the perspective of a reasonable officer on the scene." *Id.*, quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989). And here too, "a defendant's motion for summary judgment is to be denied only when . . . a

21

reasonable jury could conclude that the excessiveness of the force is so apparent that no reasonable officer could have believed in the lawfulness of his actions." *Harris v. U.S. Dep't of Veterans Affs.*, 776 F.3d 907, 913 (D.C. Cir. 2015) (alteration in original), quoting *Wardlaw*, 1 F.3d at 1303.

As with Count One, there are genuine issues of fact that preclude summary judgment on the state law claims related to the extent of Officer Robert's use of force, and the Court will defer judgment as to the actions claimed to be assault or battery. *Cf. Lin*, 47 F.4th at 847 ("Because we affirm the district court's determination that [plaintiff] failed to make out an excessive force claim, we also affirm the grant of summary judgment on [plaintiff]'s assault and battery claim.").

## B. False imprisonment and false arrest

The presence of a genuine dispute of material fact as to the existence of probable cause to arrest plaintiff for assault on a police officer also precludes summary judgment on plaintiff's claims of common law false arrest and false imprisonment. "[A]s a practical matter," false arrest and false imprisonment are "indistinguishable" under D.C. common law. *Hall v. District of Columbia*, 867 F.3d 138, 156 (D.C. Cir. 2017), citing *Enders v. District of Columbia*, 4 A.3d 457, 461 (D.C. 2010). "The essential elements of liability are (1) the detention or restraint of one against his or her will, and (2) the unlawfulness of the detention or restraint." *Id.*, quoting *Enders*, 4 A.3d at 461 (internal quotation marks omitted).

The central question raised by defendant's motion is whether he had probable cause to arrest plaintiff for assaulting a police officer, and therefore, was legally justified in doing so. Mot. at 8; *see also Wesby*, 583 U.S. at 54 (stating that false arrest under the Fourth Amendment and false arrest under D.C. law are both "predicated upon . . . arrest[] without probable cause"). Because the Court has already found that there is a genuine dispute of material fact as to whether defendant had probable cause for purposes of the Fourth Amendment claim, it cannot enter

summary judgment on the common law claims either:  the lawfulness of the restraint is still at issue.  *See Hall*, 867 F.3d at 156 (explaining that "[t]he lack of probable cause for [plaintiff]'s arrest" as to her Fourth Amendment claim "also support[ed] vacatur of the order dismissing on the pleadings [plaintiff]'s common law false arrest and imprisonment claims"); *Lin*, 47 F.4th at 845 ("Because there are genuine issues of material fact as to the existence of probable cause to arrest [plaintiff] . . . the district court erred in granting [defendant]'s motion for summary judgment on [plaintiff]'s Section 1983 claim for wrongful arrest, as well as her common law claim for false arrest.").

### C.  Intentional infliction of emotional distress

A claim of intentional infliction of emotional distress requires plaintiff to show "(1) extreme and outrageous conduct on the part of the defendants, which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress." *Futrell v. Dep't of Lab. Fed. Credit Union*, 816 A.2d 793, 808 (D.C. 2003) (internal quotation marks and alteration omitted).  The first element is satisfied only where a defendant's conduct is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Bernstein v. Fernandez*, 649 A.2d 1064, 1075 (D.C. 1998).  "The question of whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery requires a demanding showing that is a threshold question for the court." *Salem Media Group, Inc. v. Awan*, 301 A.3d 633, 657 (D.C. 2023) (internal quotation marks omitted).  But "[w]here reasonable persons may differ, it is for the jury, subject to the control of the court, to determine whether . . . the conduct has been sufficiently extreme and outrageous to result in liability." *Homan v. Goyal*, 711 A.2d 812, 818 (D.C. 1998), quoting *Drejza v. Vaccaro*, 650 A.2d 1308, 1316 (D.C. 1994).

While the Court has found that a genuine dispute of fact precludes summary judgment on the excessive force portion of Count One, that does not govern Count Six. Even if the Court accepts plaintiff's version of what took place and gives her the benefit of any inferences as it is required to do at this stage, it finds that defendant's actions do not rise to the level of extreme or outrageous conduct necessary to sustain a claim for intentional infliction of emotional distress. Plaintiff was subjected to uncomfortable and occasionally forceful physical contact, not to mention the humiliation, pain, and trauma caused by the pepper spray. But even those unpleasant events, considered together, do not constitute conduct so outrageous or extreme as to go beyond the bounds of human decency, particularly given plaintiff's own role in precipitating and escalating the encounter.

## CONCLUSION

For the reasons stated above, defendant's motion for summary judgment is **GRANTED IN PART AND DENIED IN PART**. The motion is granted, and summary judgment is entered in favor of Officer Roberts on Count Six and the portion of Count One challenging the lawfulness of plaintiff's arrest for resisting arrest. The motion is denied without prejudice as to the rest of Count One, and Counts Two, Three, Four, and Five.

**SO ORDERED.**

AMY BERMAN JACKSON
United States District Judge

DATE: March 27, 2026

24