**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **CHARMAIN TAYLOR** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | |
| **v.** | * | **CASE NO.: 1:24-cv-01643 ABJ** |
| | * | |
| **OFFICER TARIQUE ROBERTS, et al.** | * | |
| | * | |
| **Defendants.** | * | |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * *

# EXPERT OPINION OF CHARLES J. KEY, SR.

## I. QUALIFICATIONS

I retired from the Baltimore, Maryland Police Department as the Commanding Officer of the Firearms Training Unit, a position which I held for ten years. I have evaluated police policies, practices, and uses of force for over thirty years. I was a supervisor in the Baltimore Police Department for over twenty-one years. In that role I sat as a member of various tribunals in numerous Administrative Hearings; investigated dozens of uses of less than lethal force; assisted the Internal Investigation and Homicide Divisions in evaluating/investigating hundreds of police involved shootings; and wrote the Departmental General Order governing the use of force.

At the direction of the Police Commissioner, I also analyzed approximately six hundred police involved shootings to determine if the shootings were consistent with law, departmental policies, and training. In addition to issues of law and departmental policies, those analyses included crime scene reconstruction, interpreting ballistic evidence, shell casing ejection pattern testing, and

technical issues related to firearms. In the ten years I was the Commanding Officer of the Firearms Training Unit, I responded to the scene of more than one hundred police involved shooting incidents.

During my career with the Baltimore Police Department, I acquired substantial experience and developed significant expertise in the area of law enforcement officer supervision and training. As part of my duties, I developed and evaluated numerous operational guidelines and officer training programs, both for the department and for other law enforcement agencies. I personally authored the draft of the regulations regarding firearms training for law enforcement officers within the State of Maryland. Additionally, I developed and wrote, or assisted in writing, hundreds of other operational protocols, supervisory memoranda, and training related documents, including, but not limited to: the general order pertaining to the resolution of sniper, hostage, barricade situations; the general order pertaining to police officer use of force; the special weapons and tactics team's (SWAT) training program, operational protocols, physical training program, and selection standards and protocol; the recruit and in-service officer training programs for firearms, officer survival, defensive skills, riot and crowd control, use of pepper spray, and use of force; and numerous other training guidelines, policy directives, and officer training lesson plans.

My involvement with police officer training took place on several different levels. While assigned to the Tactical Section, I was responsible for the selection, training, and operational performance of SWAT personnel. As a Shift and Operations Commander, I provided daily training to my personnel in law enforcement related subjects, including, but not limited to, application for and service of search and seizure warrants, legal and operational protocols for arresting offenders,

community relations with citizens and businesses, police response to and liaison with private security, use of force and officer survival updates, etc. After being assigned as the Commanding Officer of the Firearms Training Unit, I was personally responsible for the training of several thousand police officers in subjects including, but not limited to: Fourth Amendment issues such as reasonable suspicion to detain, probable cause to arrest, and when and how to use appropriate levels of force; officer survival techniques; and firearms use. I developed and conducted numerous instructor-level courses in which police instructors were taught how to develop and implement effective training programs. I also assisted in selecting the shoot-no-shoot computer model for the Baltimore Police Department and both participated in designing scenarios for shoot-no-shoot situations and trained officers using those scenarios. In addition I developed live person training scenarios, which incorporated various use of lethal force circumstances to train police officers and civilians.

My experience and training as a supervisor with the Baltimore Police Department allowed me to develop broad expertise in law enforcement techniques as well as in the supervision and direction of individual police officers. During the course of my career with the Department, I directly supervised and/or managed hundreds of individual police officers. In my various supervisory capacities, including Quick Response Team (SWAT) Supervisor and Primary Instructor, District Shift Commander and District Operations Commander, I supervised the resolution of thousands of emergency or crisis situations and investigated, or supervised the investigation of, well over a thousand successfully prosecuted violent felonies.

As Central District Operations Commander, I was responsible for the supervision of approximately fifty personnel. Included in that number were officers detailed to the investigation of serious crimes, including narcotics enforcement activities. Such narcotics enforcement activities involved street possession and distribution arrests as well as a wiretap, which resulted in the service of approximately fifty search and seizure warrants for drug related crimes. During the eight years I was the Operations Commander, I participated in and/or supervised well over one thousand arrests for the possession and/or distribution of controlled dangerous substances and other felonies, including, but not limited to, larcenies, burglaries, robberies, sex offenses, and serious assaults. As a result, I became well versed in the legal and departmental requirements pertaining to search and seizure warrants, and the searches and seizures and/or arrests of persons involved in the distribution of illegal narcotics as well as other felonies.

As a result of this experience and training in law enforcement, I gained extensive personal familiarity with the proper methods of police officer training and conduct as well as with the proper methods of implementing policies and procedures to direct and guide individual officers in the effective performance of their duties.

I am currently employed as an independent consultant and expert witness in police misconduct litigation. In this capacity, I have reviewed well over a thousand cases involving alleged police misconduct for both plaintiffs' and defendants' counsel. Included in that number is approximately two thousand police involved shootings from various state, local, and federal jurisdictions throughout this country and the Virgin Islands. In such cases I have evaluated various

factors in order to determine if the conduct of the law enforcement personnel and/or agencies involved in the case violated legal, ethical and/or constitutional standards of conduct. Those factors include, but are not limited to: the conduct of individual law enforcement officers, the adequacy of the training and supervision received by such officers, and the adequacy and appropriateness of police department policies and procedures as they relate to operational protocols and investigatory procedures.

I am also currently the Chairman of the Board of Directors of the Harvard Associates in Police Science (HAPS),[1] an organization that teaches police officers, detectives, crime lab technicians, attorneys, medical forensic specialists, and other personnel in law enforcement related fields how to properly conduct homicide investigations.

## II. EXPERT COURT QUALIFICATIONS RELEVANT TO THIS CASE

I have previously been qualified as an expert witness as to police officer use of force in one hundred-thirteen (113) courts (eighty-nine [89] state courts and twenty-four [24] federal courts); police training in one hundred twenty-one (121) courts (ninety-five [95] state courts and twenty-26 [26] federal courts); in police policies and procedures in one hundred twenty-five (125) courts (Ninety-eight [98] state courts and twenty-seven [27] federal courts); and have been held qualified as an expert in defensive skills in forty-nine (49) courts (thirty-eight [38] state courts and eleven [11] federal courts).. My relevant training, experience, educational background, and history of court

---

[1]HAPS is no longer associated with Harvard University and is sponsored by the Office of the State of Maryland's Medical Examiner.

qualifications and depositions are set forth in more detail in the Résumé/Curriculum Vitae attached to this Affidavit as 'Exhibit A.'

## III. PUBLICATIONS

I have published no articles in the last ten years.

## IV. COMPENSATION

I am being compensated at the rate of $275.00/hour for consultation and review, and $275.00/hour for appearing in court, deposition, and/or submitting an expert report/affidavit. A minimum payment of six hours is required for appearing in court, deposition, and/or submitting an expert report/affidavit. Drive time in places requiring my presence (Court, Site Visits, Etc.) is compensated at the rate of $275.00/hr. Travel to and from airports or to and from the destination requiring my presence by plane is compensated at the rate of $150.00/hr. A per diem of $425.00 per day is charged for overnight stays.

## V. METHODOLOGY IN EXPRESSION OF OPINIONS

All of the opinions provided in this report are expressed to a reasonable degree of certainty in my fields of expertise. They are offered in each subject on which an opinion is rendered and are presented in a general statement regarding whether the acts of the officers were objectively reasonable and consistent with accepted standards of police policies, practices, and training.

Supporting opinions are then provided with more particularity in the bases for the generally held opinion.

## VI. STANDARD OF ANALYSIS

My opinions in this case were developed by viewing the facts contained in the provided materials from the perspective of an objectively reasonable officer confronted with the circumstances as they existed at the time the incident occurred. They are not conclusions as to the credibility of any of the parties.

## VII. MATERIALS REVIEWED

In reaching my conclusions and opinions as to these issues, I have relied upon my extensive personal experience and training in the field of law enforcement, which I have developed as a law enforcement officer, administrator, trainer, and as an expert witness and consultant in police-related matters. I have also reviewed various documents and materials in forming my opinions in this specific case, including, but not limited to:

1. Civil Complaint
2. Roberts BWC Video
   a. Roberts BWC Screen Shots
3. Video Entitled Ex 3 CONG_08-23-2023_0929-0939_hrs_C-F07-M-015_Thursday_August_24_202360128_aea2360
4. Electronic File Entitled Ex 2 Tarique Roberts Signed Declaration_.2
5. Taylor's Arrest Report
6. Charmain Taylor Interview Video Entitled Attachment #1 (PRI2023-025)

## *2) Documented Facts Pertinent to Opinions*

### **a)** Roberts BWC Video

| TIME | EVENT |
|---|---|
| 09:30:56 | Sound Starts |
| 09:31:05 | Taylor bumps Roberts. |
| 09:31:06 | Roberts pushes Taylor away from him. |
| 09:31:10 | Roberts tells Taylor she's under arrest three times, displays handcuffs and OC spray container. Taylor constantly yelling. Roberts tells her several times she's under arrest. |
| 09:31:12 | Roberts raises OC spray container, continues to tell Taylor she's under arrest. Taylor continues to yell and walk away. |
| 09:31:12-20 | Roberts continues to tell Taylor she's under arrest. Taylor continues to yell. At approximately 09:31:20 Roberts OC sprays Taylor. |
| 09:31:20-36 | Roberts continues to tell Taylor she's under arrest and to get on the ground. At 09:31:36 Roberts places his left hand (with cuffs in it) on Taylor's upper back. |
| 09:31:38 | Another officer grabs Taylor's left arm as she is screaming and running toward the escalator. |
| 09:31:38-55 | Taylor continues screaming and pulling away from both officers, who are attempting to pull her down and off the escalator. At 09:31:55 Taylor slides to floor. No officer touched her hair. Roberts continues telling her she's under arrest and to get on the ground. |
| 09:31:57 | Roberts attempts to get handcuffs on Taylor's right arm. Taylor has continued to attempt to pull her hands and arms away from both officers. |
| 09:32:06 | Taylor continues to pull her arms away from officers. Roberts gets a cuff on Taylor's left wrist. |
| 09:32:10 | Roberts tells Taylor to give him her other hand. |
| 09:32:10 to | |
| 09:35:32 | Roberts continues telling Taylor to give him her other hand. Roberts also tells her to roll over on her stomach, and that he will spray her again. At no point does Roberts put his knee directly on Taylor's stomach. For a short time Roberts is kneeling next to her, and her left side is touching Robert's lower leg, but his knee is not pressing down on her. The other officer tells her to stop resisting and to stand up, while sometimes patting her arm. Taylor continues screaming, attempting to pull away from officers, and hold her right arm in front of her. Both officers also |

continue to attempt to pull her right arm behind her back so that she can be handcuffed. At 09:35:32 both officers pull her to her feet.

09:35:32 to
09:36:02 Taylor continues to hold her right arm in front of her and attempt to pull away from the officers, who continue to tell her to stop resisting. At 09:36:02 Taylor sits back down on the floor.

09:36:02 to
09:36:37 Both officers continue to tell Taylor she's resisting. At 09:36:37 they pull her to her feet again.

09:36:50 Taylor's right arm pulled in back of her, and she is handcuffed.

09:36:50 to
09:44:05 Taylor is led up escalator and outside by both officers. Fire Department arrives to treat her at 09:44:05.

**b)** Roberts BWC Screen Shots

1 - Taylor Approaches Roberts

2 - Taylor Next to Roberts

3 - Taylor Just Before Contact

4 - Taylor Makes Contact

5 - Taylor Moving Away After Contact

6 - Roberts' Left Knee Next to Taylor's Left Hip

7 - Roberts' Left Knee Next to Taylor's Left Hip

8 - Roberts' Left Knee Next to Taylor's Left Hip

9 - Roberts' Left Knee Next to Taylor's Left Hip or Lower Abdomen

10 - Roberts' Left Knee Next to Taylor's Left Hip, Lower Abdomen, and on Her Right Hand

**c)** Video Entitled Ex 3 CONG_08-23-2023_0929-0939_hrs_C-F07-M-015_Thursday_August_24_202360128_aea2360

| ELAPSED TIME | EVENT |
|---|---|
| 02:24 | Taylor advances on Roberts. Roberts pepper sprays her. |

**d)** Screen Shot Entitled "11 - Roberts Sprays Taylor"

## VIII. PURPOSE OF ENGAGEMENT FOR SERVICES

I have been retained to review the facts of this case and to provide an expert opinion as to whether the actions of the Washington Metropolitan Area Transit Authority (WMATA) police officers in using force to effect the arrest of Plaintiff Charmain Taylor were objectively reasonable and consistent with accepted standards of police policies, practices, and training.

## IX. INCIDENT SYNOPSIS

### *1) Account According to Plaintiff Charmain Taylor*[2]

On Wednesday, August 23, 2023, between approximately 9:00 a.m. and 9:30 a.m., Ms. Charmain Taylor (Taylor) was dropping her school aged son off at the Congress Heights train station located in Washington. At no relevant time during [*SIC*] did Taylor violate any law. Taylor took her son into the station and prepared to watch him board the train. At that time, WMATA and DC Department of Transportation were set to implement a program known as "Kids Ride Free" for children going to school. The Kids Ride Free program allowed elementary or secondary students to ride on metrorail free of charge. The program was set to begin on the same day that District of Columbia Public Schools began school, August 28, 2023. Taylor's child, however, attended a charter school which had already begun by August 23, 2023.

Upon arriving at the train station, the minor child attempted to go through the turnstile but did have a fare card. The train was arriving in less than one minute so the child then went through the turnstile and was stopped by WMATA Officer Tarique Roberts (Roberts). Taylor asked Roberts

---

[2]Copied from the Plaintiff's Civil Complaint. The allegations contained in the Civil Complaint are not offered for their credibility and do not reflect the conclusions of this writer.

to let the child ride to school and reminded Roberts of the forthcoming Kids Ride Free program. However, before any further conversation could commence, a stranger offered the minor child a fare card, which the boy took and headed onto the arriving train, which arrived a few seconds after the child received the card.

Taylor then attempted to walk away and back towards her waiting vehicle. Roberts insisted that Taylor stay and listen to him as he harassed, harangued, and berated her. As Taylor had violated no law, she exercised her right to be left alone and attempted to begin walking towards the escalator to her car.

Without justification and for no apparent reason, Roberts pushed Taylor with enough force that she had to brace herself on a railing to keep from falling. Taylor was shocked and startled by the abuse and angrily stood to her feet and again attempted to walk towards her vehicle. After Taylor again rejected Roberts's overtures, he became infuriated. Roberts then followed her a few steps, he deployed his WMATA issued pepper spray directly into Taylor's face, and yanked her to the ground by pulling her hair - even though Taylor had violated no law. Taylor begged Roberts to allow her to leave and continued to try to leave the station, as she had committed no crime and was not interested in any further interactions, with Roberts. Taylor began to cough, gasp for air and scream in agony from pain of the assault and the burn of the pepper spray. Roberts refused to stop the assault. Instead, he attempted to bend Taylor's arm in unnatural directions while trying to handcuff Taylor which caused Taylor significant pain. Roberts further forcefully squeezed Taylor's wrist and placed his knee in her side. Taylor, who was blinded and her eyes severely burning, begged and pleaded with Roberts to discontinue his assault on her.

A second WMATA Officer, John Doe (Doe), came to assist Roberts with the assault of Taylor. While on the ground, Roberts, who is significantly larger in stature than Taylor, began choking Taylor and continued to dig his knee into Taylor's stomach. While Taylor was lying on her back and Roberts had his knee in her stomach, the officers ordered Taylor to turn over which she could not do because the officer's knee was in her stomach. Taylor continued to beg the officers to stop assaulting her but they continued the assault and kept saying "stop resisting".

A bystander's cell phone video contradicts the idea that Taylor was resisting arrest. Taylor could not resist the arrest even if she so desired as she was still blinded and injured from the earlier deployment of the officer's pepper spray and the had his knee in her stomach while issuing orders to Taylor. Throughout the attack Taylor was confused and feared for life because she had not broken any laws.

Taylor was ultimately arrested by the Defendants and taken to D.C. Superior Court, where the "charges" against her were "no papered". The assault left Taylor in pain and with scratches, bruises and post-traumatic stress disorder. She could not se out of one of her eyes for several days.

***2) Account According to Defendants***[3] [4]

---

[3]Taken from Taylor's arrest report, Robert's signed declaration, Roberts' body worn camera (BWC) video, and WMATA station videos. NOTE: Actions of the officers or Taylor documented by the videos will be cited when applicable and serve as part of the bases for this writer's opinions.

[4]This writer took screen shots of relevant portions of the videos. Those videos and screen shots are attached hereto and fully incorporated herein as part of this Disclosure in support of the opinions expressed in this report. NOTE: The titles of the screen shots are descriptions of what is occurring at the elapsed time on the video.

Taylor, walked by Roberts with her child. Taylor did not ask him any questions nor interact with him as she approached the fare gates. Taylor directed her child to pass through the closed emergency swing gate. Roberts saw the child unsuccessfully try to go through the emergency swing gate, which is not available for passengers in the normal course of business. It became clear to Roberts that neither Taylor nor her child had a SmarTrip card to enter the Metro system.

The swing gate has a sign in red, with large letters that state "EMERGENCY EXIT ONLY AUTHORIZED USE ONLY VIOLATORS SUBJECT TO CITATION." Roberts approached Taylor and her child, knowing that schools were starting again and wanting to take the opportunity to inform Taylor and her child about the requirements to enter the WMATA system and how to get a "Kids Ride Free" (KRF) card; the dissemination of this information was part of Roberts' detail at the station. Roberts' goal was to explain the proper procedures to Taylor, and then let her child go through the fare gates without a WMATA SmarTrip card. Roberts told Taylor several times he would let her child pass through the gates without one. This was confirmed by Taylor in her post incident interview with a WMATA investigator.

Students enrolled in District schools may ride the Metro system for free, as long as they have a specialized SmarTrip card for students, informally called a KRF card. To receive a KRF card, the student must request a KRF card at the school where the student is enrolled, and the student will receive a SmarTrip card that is registered and assigned to that particular student.

Roberts told Taylor he would let her child through the faregates this time without a SmarTrip card, however, he wanted to make sure she was aware of how to get the KRF card for future use, so

that her child could use the Metrorail system without any additional problems. Part of Roberts' duties at the station was to make the public aware of WMATA's rules in using its system.

Taylor ignored Roberts and what he was trying to tell her; instead, after directing her child to unsuccessfully open the swing gate, she immediately walked away from him to try and open the emergency swing gate herself.

Taylor was unsuccessful at opening the emergency swing gate which is calibrated so it cannot be easily pulled open by passengers who do not wish to pass through the fare gates. WMATA requires that passengers use a SmarTrip card to enter its Metrorail system and it is against WMATA's rules of conduct to enter the Metrorail system through the emergency swing gate in the normal course of business, as can be seen by its sign on the swing gate. Taylor also had directed her son to try and push through the fare gates, which is also not allowed under WMATA's rules of conduct for its system. Pushing through the faregates without using a SmarTrip card to activate the gates can break the faregates, and cause thousands of dollars of damage.

Taylor became very agitated because she could not get her son through the gates in ways that are against WMATA policy and rules. Taylor's conduct became aggressive toward Roberts, and she approached to confront him within inches of his face. She balled up her fists, leaned aggressively forward toward Roberts, and yelled angrily in his face. (See Roberts' Declaration, Exhibit 2, ¶ 26' Exhibit 5, Roberts BWC at 9:30:53 and Exhibit 2, ¶ 25; Exhibit 3,Congress Heights station video M15 at 9:30:54 a.m.) Taylor's actions by balling her fists as if she were ready to fight, approaching close to Roberts aggressively, and yelling into his face led him to believe and fear that she was about

to physically assault him. Those actions gave Roberts probable cause to believe that Taylor was committing the crime of an assault on a police officer.

At about the same time Taylor was angrily yelling at Roberts, another passenger approached the fare gates and gave her a fare card, which Taylor then used to let her child into the Metro system. After her son left through the gates, Taylor turned, looked at Roberts and walked straight towards him. Taylor collided with Roberts, and as she did so, she bent and flailed her right arm outward towards him.[5] Roberts did not consent to her physically contacting him and found it to be offensive. At the time the contact occurred, Taylor's actions gave Roberts additional probable cause to believe that she had committed the crime of an assault on a police officer.

One second after Taylor's assault on Roberts, Roberts' BWC video at 09:31:06 recorded him pushing Taylor away from him. In his declaration Roberts explained that he had been trained by the police department to create distance between himself and someone who is a threat, in order to provide additional time to assess the potential danger and his options to respond to the threat.

Roberts' BWC video then records the following:

| | |
|---|---|
| 09:31:20-36 | Roberts continues to tell Taylor she's under arrest and to get on the ground. At 09:31:36 Roberts places his left hand (with cuffs in it) on Taylor's upper back. |
| 09:31:38 | Another officer grabs Taylor's left arm as she is screaming and running toward the escalator. |

---

[5]See Roberts BWC Video at 09:31:05, Screen Shots entitled *1 - Taylor Approaches Roberts, 2 - Taylor Next to Roberts, 3 - Taylor Just Before Contact, 4 - Taylor Makes Contact, 5 - Taylor Moving Away After Contact*, and screen shots depicted in Roberts' Declaration Station video camera M15 at 9:31:06 (A) and (B).

| | |
|---|---|
| 09:31:38-55 | Taylor continues screaming and pulling away from both officers, who are attempting to pull her down and off the escalator. At 09:31:55 Taylor slides to floor. No officer touched her hair. Roberts continues telling her she's under arrest and to get on the ground. |
| 09:31:57 | Roberts attempts to get handcuffs on Taylor's right arm. Taylor has continued to attempt to pull her hands and arms away from both officers. |
| 09:32:06 | Taylor continues to pull her arms away from officers. Roberts gets a cuff on Taylor's left wrist. |
| 09:32:10 | Roberts tells Taylor to give him her other hand. |
| 09:32:10 to | |
| 09:35:32 | Roberts continues telling Taylor to give him her other hand. Roberts also tells her to roll over on her stomach, and that he will spray her again. At no point does Roberts put his knee directly on Taylor's stomach. For a short time Roberts is kneeling next to her, and her left side is touching Robert's lower leg, but his knee is not pressing down on her.[6] The other officer tells her to stop resisting and to stand up, while sometimes patting her arm. Taylor continues screaming, attempting to pull away from officers, and hold her right arm in front of her. Both officers also continue to attempt to pull her right arm behind her back so that she can be handcuffed. At 09:35:32 both officers pull her to her feet. |
| 09:35:32 to | |
| 09:36:02 | Taylor continues to hold her right arm in front of her and attempt to pull away from the officers, who continue to tell her to stop resisting. At 09:36:02 Taylor sits back down on the floor. |
| 09:36:02 to | |
| 09:36:37 | Both officers continue to tell Taylor she's resisting. At 09:36:37 they pull her to her feet again. |
| 09:36:50 | Taylor's right arm pulled in back of her, and she is handcuffed. |

Roberts' declaration is consistent with his and Taylor's recorded actions during the rest of the confrontation. After the OC spray, Taylor continued to attempt to evade Roberts and try to flee

[6]Screen shots entitled *6 - Roberts' Left Knee Next to Taylor's Left Hip, 7 - Roberts' Left Knee Next to Taylor's Left Hip, 8 - Roberts' Left Knee Next to Taylor's Left Hip, 9 - Roberts' Left Knee Next to Taylor's Left Hip or Lower Abdomen, 10 - Roberts' Left Knee Next to Taylor's Left Hip, Lower Abdomen, and on Her Right Hand* document the fact that Roberts' knee was not on either Taylor's back or stomach.

by going up a set of escalators that led to the outside of the Metrorail station. Despite his numerous orders for her to give him her hands, for her to roll over, for her to stop resisting, Taylor failed to comply with all of Roberts' directives.

Taylor refused to put her hands behind her back, and she actively struggled against Roberts' and the efforts of another officer, who came to help him handcuff Taylor. Taylor continued to actively pull her arms away from both officers and kicked out her legs while she struggled against them. After several minutes of her struggling against them, they were able to place handcuffs on her and escort her upstairs out of the station.

Subsequent to treatment by EMTs, Taylor was transported to United Medical Center. It is MTPD's standard policy to take an arrestee to be checked out at a medical center or hospital after OC exposure. Taylor refused any treatment at United Medical Center, except for taking some Tylenol. After being released from United Medical Center, Taylor was then transported to MPD 7th District for processing.

## X. <u>OPINIONS AND BASES OF OPINIONS</u>

***1) Opinion Regarding Whether the Actions of the Washington Metropolitan Area Transit Authority (Wmata) Police Officers in Using Force to Effect the Arrest of Plaintiff Charmain Taylor Were Objectively Reasonable and Consistent with Accepted Standards of Police Policies, Practices, and Training.***

It is my opinion that the actions of the Washington Metropolitan Area Transit Authority

(WMATA) police officers in using force to effect the arrest of Plaintiff Charmain Taylor were objectively reasonable and consistent with accepted standards of police policies, practices, and training. were objectively reasonable and consistent with accepted standards of police practices, policies, and training.

***BASES***

> The Fourth Amendment "reasonableness" inquiry is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, and its calculus must embody an allowance for the fact that police officers are often forced to make split-second decisions about the amount of force necessary in a particular situation. . .
>
> The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments - in circumstances that are tense, uncertain, and rapidly evolving - about the amount of force that is necessary in a particular situation. (Citations Omitted)[7]

From the standpoint of an objectively reasonable and well trained officer, the previously listed videos of this incident determine to a certainty that the totality of circumstances confronting Roberts in this incident were that Taylor did put Roberts in fear of being assaulted by aggressively confronting him while within striking distance with clenched fists and did commit a misdemeanor assault against him by bumping into him and pushing against him with her elbow. This was in addition to having violated WMATA's rules for the citable offense of using the emergency swing

---

[7]*Graham v. Connor* (490 U.S. 386,1989) Pp. 396-397.

gate. Further, she repeatedly refused to obey his lawful directives telling her she was under arrest, to get on the ground, to give him her other hand so she be handcuffed, and to stop resisting his and the other officer's efforts to control and take her into custody.

Officers, including WMATA officers, are trained that they may use force against a person who is actively resisting their efforts to control or arrest them. Active resistance occurs when a subject makes physically evasive movements to defeat an officer's attempt to control or arrest her/him. As the screen shots and videos document, until Taylor was finally handcuffed she continued trying to leave, kept pulling her arms away, and holding her right hand in front of her near her waist. All of these actions are actively resisting the officers' efforts to control and arrest her.

Officers may use whatever force that is objectively reasonable to overcome the level of resistance offered. They are not required to use a lesser force option before using the amount of force reasonably necessary to overcome the threat or resistance they are confronting. To control a person who is actively resisting, officers may use strikes with personal weapons[8] or batons to areas of the body which are not likely to cause serious injury.

In this case Taylor had not been frisked. Officers, including WMATA officers, are trained that they are to consider a person who is being arrested to be armed until that person is searched. Police, including WMATA officers, are trained that weapons are most likely to be found in or around a person's waistline. Nor is the fact that the weapon is not readily visible an indication that no

---

[8]In defensive skills training, personal weapons are those parts of the anatomy that can be used to inflict injury. They include: head, teeth, elbows, forearms, fists, knees, and feet.

weapon is present. There are handguns as small or smaller than a deck of cards. Knives, which are as deadly as a gun in situations in which the opponent is within arm's reach, can be hidden in places close to the waistline which makes them readily accessible but not easily detectable.

Although Taylor was actively resisting the officers and strikes to nonlethal areas of her body would have been reasonable, in this case the only uses of force against her was the disengagement push and the OC spray when Taylor was aggressively advancing toward Roberts. OC spray is used to gain compliance to a lawful order when there is active resistance or threatening behavior demonstrated by the person on whom the OC spray is used. Since Taylor had from the beginning demonstrated aggressive and threatening behavior toward Roberts, including actually making offensive contact with him, the use of OC spray when she aggressively advanced on him was objectively reasonable and consistent with nationally accepted standards of police policies, practices, and training.

As to the push to propel Taylor away from Roberts, officers, including WMATA officers, are trained that gaining distance by moving someone out of the proximity that would permit an attack is warranted when that person displays aggressive and/or potentially assaultive behavior toward the officer. Further, Roberts needed to be able to assess Taylor's threat and how to deal with it. Since Taylor was recorded displaying anger with her raised voice and clenched fists and actually physically contacted Roberts with her elbow as she walked past him, the use of the push to gain distance was objectively reasonable and consistent with nationally accepted standards of police policies, practices, and training.

The attempts by the officers to pull her right hand behind her so that she could be handcuffed would not be considered a use of force unless those efforts were accomplished by using either pain compliance or joint manipulation techniques. No such techniques were used. Simply pulling on a person's arm to bring it to their back so that they can be handcuffed is neither a pain compliance nor joint manipulation technique.

Also, the officers could have and have been trained to use techniques to take her to the ground with force. Officers, including WMATA officers, are trained that taking subjects to the ground is safer for the officer and the subject. As long as subjects are standing, they can strike with arms or legs, move about, reach for a weapon, etc. When subjects are on the ground, they are much more restricted in their movements and, therefore, much less likely to do something which will cause the officer to have to escalate the amount of force used; thus, it is generally safer for both the officer and the subject to put her/him on the ground. In this incident Taylor was not taken to the ground. Roberts' BWC video recorded her either sliding to the ground or sitting down. No techniques were used to take her to the ground.

No videos of the incident showed Roberts choking Taylor or pulling her hair. In point of fact Roberts showed restraint by not using strikes, pain compliance, or joint manipulation techniques even though Taylor's actions would have made their use objectively reasonable. Roberts' display of handcuffs and OC spray, and constant orders to stop resisting instead of using more aggressive force techniques, was an effort to de-escalate the situation. De-escalation is defined as any verbal or physical act taken to resolve a situation without using any force or more force; thus, his displaying

the OC spray cannister, threatening to use it again, and continuing to give commands to stop resisting were attempts to gain compliance without using the force that was reasonable when considering Taylor's active resistance.

Additionally, although his BWC video determines he did not put his knee on Taylor's body, if he had done so, putting a knee on the body of someone who is actively resisting being handcuffed is an appropriate technique taught by every federal, state, and local police agency of which I'm aware in this country.

Anytime an officer goes hands-on with someone there is an increased risk of injury to both the officer and the subject. Also, the fact that an injury resulted from a use of force does not, by itself, determine that the force used was excessive. Use of force means exactly what it implies: physical coercion used to force compliance. There are no magic use of force procedures which are guaranteed not to result in injury. Unintended injuries can, and do, happen. Further, by their very nature, strikes and take-downs can possibly result in serious injuries. There is simply no way to train officers how to restrict the power of a punch or, in some manner, cushion the force that is used in a way that will prevent any injuries to a subject and, at the same time, ensure that it will be of sufficient force to convince the subject to comply with commands and/or control the subject's resistance. Injuries in a use of force are directly related to the amount of resistance offered by the subject: the more the subject resists, the more force will have to be used to effect control, and the more likely injuries will occur.

In this incident Taylor's continued active resistance to being handcuffed exposed her to having more force used against her than Roberts employed with the potential of sustaining more injuries than she actually did. All of the actions of the WMATA officers in attempting to gain control and arrest Taylor were, therefore, objectively reasonable and consistent with nationally accepted standards of police policies, practices, and training.

## XI. RIGHT TO AMEND RESERVED

I reserve the right to amend my opinions as expressed in this report when or if further facts, materials, reports, and/or any other evidence is submitted/presented for my review.

August 24, 2026

DATE

CHARLES J. KEY