# Expert Witness Use-of-Force Analysis

Taylor v. Roberts, WMATA, et al.

Civil Action No. 1/24/CV-01643-ABJ

Trevor R. Hewick

Expert Witness Use-of-Force Analysis

I, Trevor R. Hewick, was retained by Counsel Randy McDonald to give an Expert Witness Use-of-Force analysis and an opinion for an Officer Involved Use of Force (UOF) incident that occurred on August 23, 2023, at about 9:30 a.m., at the Congress Heights Metrorail Station located at 1290 Alabama Ave. SE, Washington, DC 20032.

A current version of my curriculum vitae (CV) is attached hereto as Attachment 1 that will also include a list of prior testimony and designations as an expert witness within the last 10 years.

As a result of my training, education, prior employment, and experience, I am familiar with the training, practices, policies, procedures, and General Orders regarding the use of force and proper police procedure by members of the Metropolitan Police Department ("MPD"), and the Washington Metropolitan Area Transi5t Authority (WMATA) Metro Transit Police Department (MTPD) with national standards for the use of force and proper police procedures by law enforcement officers.

In addition to my training, education, prior employment, and experience, I will render an opinion and give testimony based upon my review of the Body Worn Cameras (BWC) from the August 23, 2023, incidents, the video footage from inside of the Congress Heights Station on August 23, 2023, photographs/video of the plaintiff immediately following the incidents at issue, law enforcement reports on the incidents, the training given to members of MPD/MTPD regarding the use of force, national standards on the use of force and police procedures, MPD General Orders, MTPD General Orders and an interview of the plaintiff by an Internal Affairs Department (IAD) MTPD Detective.

Moreover, my testimony will incorporate a Constitutional Policing Framework, a Cynefin Critical Decision-Making Framework for Law Enforcement, a Force Continuum Wheel Model, and an 8 Prone Risk Factors Model in a behavioral analysis of all the parties' actions, to include but not limited to human and physiological factors, in the critical decision-making analysis of this use-of-force event. Please review conferences and training courses I have attended that will incorporate these discussions from literature and training courses as referenced in my curriculum vitae.




Constitutional Policing Framework




Cynefin Critical Decision-Making Framework for Law Enforcement




Force Continuum Wheel Model




8 Prone Risk Factors Model

I have reviewed the below described case material referenced in consideration of my Expert Witness Excessive Use-of-Force Anaylsis:

1. Ex 20-1 Expert opinion of Charles J. Key Jr (23x)
2. Ex 20-2 Resume of Charles J. Key Jr. (32x)
3. Ex 20-3 BWC Roberts of Taylor (2x)
4. Ex 20-4 BWC Roberts of Taylor (3x)
5. Ex 20-5 unknown BWC (1x)
6. Ex 20-6 unknown BWC (1x)
7. Ex 20-7 unknown BWC (1x)
8. Ex 20-8 BWC Roberts of Taylor (1x) handcuffs
9. Ex 20-9 BWC Roberts of Taylor (1x) handcuffs
10. Ex 20-10 BWC Roberts of Taylor (1x) handcuffs
11. Ex 20-11 BWC Roberts of Taylor (1x) handcuffs Ex 20-12 BWC Roberts of Taylor (1x) handcuffs
12. Ex 20-13 Timeline of Roberts' BWC video (2)
13. Ex 20 Defendant's Rule 26(a)(2) Expert Disclosure (2x)
14. MTPD General Order No. 105 Authority and Jurisdiction (4x) 06012010
15. MTPD General Order No. 106 Organization and Direction (6x) 10232013
16. MTPD General Order No. 130 Use of Force (4x) 01192012
17. MTPD General Order No. 132 Conducted Electronic Weapons (6x) 03012018
18. MTPD General Order No. 325 Contacts, Stops and Frisks (5x) 06012001
19. MTPD General Order No. 601 Arrest Policy (2x) 06012001
20. WMATA Title VI Program Update 2023 Triennial Submittal (87x) December 2023
21. MTPD General Order No. 422 Body Worn Camera (17x) 01272023
22. MPDC General Order No. 901.07 Use of Force (24x) 010152022
23. Prone Restraint Risk Factors (lecture & video)
    a. https://www.youtube.com/shorts/EqBu0GV2g3U
    b. https://gtdscientific.com/blog/when-prone-restraint-becomes-risky/
    c. https://www.youtube.com/shorts/aj2sBDMD97Q
    d. https://gtdscientific.com/wp-content/uploads/2026/08/Police1-How-officers-can-reduce-the-risks-of-prone-restraint.pdf
    e. https://www.youtube.com/shorts/4FKf9_EGUlo
    f. https://www.youtube.com/watch?v=xOWFTd3z8DY

24. Sabre Crossfire Oleoresin Capsicum (OC)
    a. Sabre Student Program
    b. Sabre Test
    c. Sabre Generation 1 2 3 (video)
    d. Sabre Versatility (video)
    e. Sabre Proper OC Deployment (video)
    f. Sabre Crown Management (video)
    g. OC Spray AA Cty Training Academy (video)

**Factual Background**

On Wednesday, August 23, 2023, at about 9:30 a.m., the Plaintiff Ms. Charmain Taylor (Ms. Taylor) escorted her 11-year-old school aged son into the WMATA Congress Heights Metrorail station located at 1290 Alabama Ave SE, Washington, DC 20032. Ms. Taylor took her son into the Metrorail station and prepared to watch her son enter into the secure Metrorail station through the handicap gate and board the Metrorail train without a school SmarTrip MetroCard.[1]

At that time, WMATA and the DC Department of Transportation were set to implement a program known as "Kids Ride Free" for children going to school. The "Kids Ride Free" program allowed elementary or secondary students to ride on Metrorail free of charge. The program was set to begin on the same day that District of Columbia Public Schools began school, August 28, 2023. Ms. Taylor's 11-year-old son, however, attended a charter school, which was to begin on the day of this event, August 23, 2023.

One minute and three seconds **<u>prior</u>** to Ms. Taylor escorting her 11-year-old school aged son into the WMATA Congress Heights Metrorail station,[2] MTPD Officer G. Hall, along with 2 private security officers, were stationed inside of the secured SmarTrip MetroCard fare gates of the Metrorail station. MTPD G. Hall is conversing with an unknown male in the presence of the 2 private security guards and the Kiosk attendant.[3] MTPD Officer G. Hall, while using his SmarTrip MetroCard, allows the unknown

[1] Exhibit #38/Attachment 3
[2] Exhibit #38/Attachment 3
[3] Exhibit #31/Attachment 3

male to exit through the MetroCard fare gate without the unknown male paying the required fare.[4] MTPD Officer Roberts is pictured in this event and was stationed outside of the SmarTrip MetroCard fare gates of the Congress Heights Metrorail station as the unknown male fare evader was allowed to exit the Metrorail station.

Ms. Taylor's 11-year-old son attempted to enter the secure Metrorail station through the handicap gate.[5] The handicap gate is alongside the Kiosk of the Metrorail station, which was occupied by a WMATA employee. The handicap gate was locked, and Ms. Taylor's 11-year-old son could not gain entry to the secure Metrorail station. An unknown female private security guard walked over to the locked handicap gate where Ms. Taylor's 11-year-old son was attempting to gain entry but stopped short of the locked handicap gate when MTPD Officer Roberts engaged Ms. Taylor in a police contact and conversation.[6]

It is unknown what the true and accurate conversation of the police officer contact was between Ms. Taylor and MTPD Officer Roberts because MTPD Officer Roberts failed to activate his BWC during the initial police officer contact and conversation with Ms. Taylor. From the audio of MTPD Officer Roberts' BWC, it is believed that the police officer contact and conversation with Ms. Taylor involved Ms. Taylor's 11-year-old son not being allowed to gain entry into the secure Metrorail station without a SmarTrip MetroCard. MTPD Officer G. Hall and the 2 unknown private security officers stood in the secure area of the Metrorail station, as MTPD Officer Roberts conducted this police officer contact and conversation with Ms. Taylor.[7]

During MTPD Officer Roberts police officer contact and conversation with Ms. Taylor, Ms. Taylor attempted to have her 11-year-old son enter the secured Metrorail station through a SmarTrip MetroCard fare gate in full view of MTPD Officer Roberts, MTPD Officer G. Hall and the 2 private

---

[4] Exhibit #32, #33, & #34/ Attachment 3
[5] Exhibit #39/Attachment 3
[6] Exhibit #40/Attachment 3
[7] Exhibit #41/Attachment 3

security guards, without a SmarTrip MetroCard.[8] [9] MTPD Officer G. Hall stops Ms. Taylor's 11-year-old son from entering the MetroCard fare gate.[10] [11]

MTPD Officer Roberts walks closer to Ms. Taylor and continues the police officer contact and conversation with Ms. Taylor.[12] Ms. Taylor steps back away from MTPD Officer Roberts and advises her 11-year-old son to attempt to gain entry again, through the MetroCard fare gate.[13] MTPD Officer Roberts closes in on Ms. Taylor by 2 meters and continues the police officer contact and conversation with Ms. Taylor.[14] The 11-year-old son was not able to gain entry.

An unknown male WMATA fare rider enters the police officer contact scene with 2 SmarTrip MetroCard in hand.[15] This unknown male WMATA fare rider walks between MTPD Officer Roberts and Ms. Taylor and begins to hand Ms. Taylor a SmarTrip MetroCard for her son, and the **volume starts** on MTPD Officer Roberts' BWC.[16]

Ms. Taylor accepts the SmarTrip MetroCard from the unknown male WMATA fare rider and utilizes the SmarTrip MetroCard to have her 11-year-old son enter the MetroCard fare gate.[17] MTPD Officer Roberts closes ground on Ms. Taylor as she is allowing her 11-year-old son to enter the MetroCard fare gate.[18] After utilizing the SmarTrip MetroCard for her 11-year-old son to gain entry into the MetroCard fare gate, Ms. Taylor enters the MetroCard fare gate area and reaches over the MetroCard fare gate screen to hand the SmarTrip MetroCard to her son. MTPD Officer Roberts continued to close ground behind Ms. Taylor and get closer to Ms. Taylor's space, while Ms. Taylor was standing inside the MetroCard fare gate entrance.[19] Ms. Taylor's 11-year-old son enters the Metrorail station to the Metrorail train platform and gets off to school.

The initial reason for the police officer contact and conversation with Ms. Taylor is over and no need for any further police action.

---

[8] Exhibit #1/Attachment 2
[9] Exhibit #45/Attachment 3
[10] Exhibit #2/Attachment 2
[11] Exhibit #45/Attachment 3
[12] Exhibit #45 & #46/Attachment 3
[13] Exhibit #47/Attachment 3
[14] Exhibit #48/Attachment3
[15] Exhibit #48 & #49/Attachment 3
[16] Exhibits #3/Attachment 2
[17] Exhibit #50/Attachment 3
[18] Exhibit #50/Attachment 3
[19] Exhibit #51/Attachment 3

After MTPD Officer Roberts had closed space from behind on Ms. Taylor's space, Ms. Taylor turns around after sending her 11-year-old son off to the Metrorail train platform. MTPD Officer Roberts was standing right behind Ms. Taylor.[20] As Ms. Taylor turns around from the MetroCard fare gate entrance area, there is contact between Ms. Taylor and MTPD Officer Roberts that is very limited, if any. This is not an intentional or willful contact or touching on Ms. Taylor's part.[21] If there was any contact, it was towards the equipment MTPD Officer Roberts was wearing on his armor vest. MTPD Officer G. Hall, the 2 private security guards, the Kiosk attendant, and the other WMATA employee continue look on.

After the contact, MTPD Officer Roberts applies a 2-hand straight-arm push against Ms. Taylor's right side of her upper body.[22] Again, MTPD Officer G. Hall, the 2 private security guards, the Kiosk attendant, and the other WMATA employee continue look on.

After MTPD Officer Roberts applied a 2-hand straight-arm push against Ms. Taylor's right side of her upper body, the force of the 2-hand straight-arm push against Ms. Taylor sends Ms. Taylor to the concrete barrier with a railing (about 3 meters).[23] MTPD Officer Roberts immediately unholsters his department issued OC Spray and advises Ms. Taylor she is under arrest.[24] MTPD Officer G. Hall, the 2 private security guards, the Kiosk attendant, and the other WMATA employee continued to look on.

MTPD Officer Roberts now retrieves his department issued handcuffs in an attempt to handcuff Ms. Taylor. Ms. Taylor has retreated to MTPD Officer G. Hall and has a conversation with MTPD Officer G. Hall, while he was standing behind the handicap gate entrance.[25] Ms. Taylor resists handcuffing by MTPD Officer Roberts.[26] MTPD Officer G. Hall, the 2 private security guards, the Kiosk attendant, and another WMATA employee continued to look on.

Ms. Taylor walks away from MTPD Officer Roberts towards the escalators of the Metrorail station, when MTPD Officer Roberts deploys his OC Spray towards Ms. Taylor with 1 burst to the right-side face of Ms. Taylor.[27] Ms. Taylor then flees out of the video picture view, being followed by MTPD Officer Roberts. MTPD Officer G. Hall walks over to assist MTPD Officer Roberts.[28]

MTPD Officer G. Hall first places hands on Ms. Taylor at the base of the escalators.[29] Ms. Taylor is taken to the ground by MTPD Officer Roberts and MTPD Officer G. Hall in an attempt to

---

[20] Exhibit #51/Attachment 3
[21] Exhibit #52/Attachment 3 & Exhibit #4/Attachment 2
[22] Exhibit #53/Attachment 3
[23] Exhibit #54/Attachment 3 & Exhibit #5/Attachment 2
[24] Exhibit #54/Attachment 3
[25] Exhibit #55/Attachment 3 & Exhibit #6/Attachment 2
[26] Exhibit #56/Attachment 3
[27] Exhibit #57/Attachment 3 & Exhibit #7/Attachment 2
[28] Exhibit #58/Attachment 3
[29] Exhibit #8/Attachment 2

handcuff Ms. Taylor. After taking Ms. Taylor to the hard-surfaced concrete floor at the base of an escalator, MTPD Officer Roberts repeatedly orders Ms. Taylor to "… put your stomach on the ground". MTPD Officer G. Hall repeatedly advises Ms. Taylor to "stop resisting".[30] Ms. Taylor is breathing heavily and exhibits signs of being heavily OC sprayed to the right side of her face, right eye, nose, throat, neck, chest, shoulders, arms, and head. Ms. Taylor is exhibiting signs of pain and distress.

Both MTPD Officer Roberts and MTPD Officer G. Hall threaten to {we} spray Ms. Tayor again.[31] MTPD Officer G. Hall asks Ms. Taylor to sit up, and Ms. Taylor starts to comply.[32] MTPD Officer Roberts then attempts to execute an armbar hold to bring Ms. Taylor's left arm behind her back. Ms. Taylor exhibits signs of pain.[33] Both MTPD Officer G. Hall and MTPD Officer Roberts repeatedly ask Ms. Taylor to sit up. Ms. Taylor starts to sit up, and MTPD Officer Roberts applies a handcuff wrist hold raising Ms. Taylor arm, inflicting pain on Ms. Taylor.[34]

Ms. Taylor is still not handcuffed properly, and MTPD Officer G. Hall keeps advising Ms. Taylor she's resisting. Ms. Taylor advises the MTPD Officers she can't see. Ms. Taylor wants to "… can I wipe her face first." and showing signs of pain.[35] MTPD Officers will not allow Ms. Taylor to wipe her face because they keep trying to handcuff her left wrist to her right wrist. Ms. Taylor is still showing signs of pain.[36] Ms. Taylor attempts to sit up, but falls back to the ground[37], but because MTPD Officer Roberts is applying an arm lock and handcuffed wrist lock that involves pain compliance against Ms. Taylor, while being advised by the MTPD Officers that she is resisting.[38] MTPD Officer Roberts handcuffs Ms. Taylor at **<u>09: 36.50</u>** after the initial OC spraying of Ms. Taylor at **<u>09:31.22</u>**.[39] Ms. Taylor continues to cough and is still exhibiting signs of pain and physiological issues.[40]

After being taken to the street level of the Congress Heights Metrorail station, Ms. Taylor advises other MTPD Officers "… I can't see, I can't breathe, my body is burning, spitting, …" and drooling from the mouth.[41] Ms. Taylor states, "… my nose it burns, my eye." and is breathing heavily and drooling

---

30 Exhibit #9/Attachment 2
31 Exhibit #10/Attachment 2
32 Exhibit #11/Attachment 2
33 Exhibit #11/Attachment 2
34 Exhibit #12/Attachment 2
35 Exhibit #13/Attachment 2
36 Exhibit #14/Attachment 2
37 Exhibit #15/Attachment 2
38 Exhibit #16/Attachment 2
39 Exhibit #17/Attachment 2
40 Exhibit #17/Attachment 2
41 Exhibit #18/Attachment 2

profusely.[42] A witness advises she called for ambulance; they didn't call anybody.[43] Ms. Taylor has not received any medical treatment until a DCFD Engine arrives on the scene at 09:44.14. Twelve Minutes and .52 seconds after Ms. Taylor had been OC sprayed.[44] MTPD Officer Roberts cleaning his hands before Ms. Taylor has received any medical treatment.[45]

Ms. Taylor states, "… I can't breathe, that shit is in my throat…".[46] Ms. Taylor complains to DCFD her wrist is already broke.[47] Ms. Taylor receives medical attention to her eye and face by DCFD at 09:47.57. [48]. Ms. Taylor has her face being washed off by DCFD.[49] Ms. Taylor, "… It's hurting, it's burning like crazy, every time I move it burns …".[50] A female MTPD Officer L. Christian assists DCFD in washing off Ms. Taylor's face.[51] DCFD washing off Ms. Taylor's face.[52] Ms. Taylor states, "… I need some air, I can't breathe…". MTPD Officer L. Christian assisting Ms. Taylor with wiping her face with wet cloth.[53] MTPD Transporting Ms. Taylor to hospital.[54]

While WMATA MTPD officers were dealing with Ms. Taylor at the street level of the Congress Heights Metrorail station numerous WMATA fare evaders were being allowed to jump the handicap gates and the SmarTrip MetroCard fare gates, private security guards and Kiosk attendees were present:

1. The female private security guard allows an adult male to jump the other handicap gate admittance without a SmarTrip MetroCard [55]
2. An unknown male jumps the handicap gate without a SmarTrip MetroCard; the male private security guard allows the jumper through[56]
3. Another unknown male jumps the handicap gate without a SmarTrip MetroCard; the male private security guard allows the jumper through[57]

---

[42] Exhibit #19/Attachment 2
[43] Exhibit #20/Attachment 2
[44] Exhibit #21/Attachment 2
[45] Exhibit #22/Attachment 2
[46] Exhibit #23/Attachment 2
[47] Exhibit #24/Attachment 2
[48] Exhibit #25/Attachment 2
[49] Exhibit #25/Attachment 2
[50] Exhibit #26/Attachment 2
[51] Exhibit #27/Attachment 2
[52] Exhibit #28/Attachment 2
[53] Exhibit #29/Attachment 2
[54] Exhibit #30/Attachment 2
[55] Exhibit #60/Attachment 3
[56] Exhibit #61/Attachment 3
[57] Exhibit #62/Attachment 3

4. An unknown female jumps the handicap gate without a SmarTrip MetroCard; the male private security guard allows the jumper through[58]
5. Another unknown male jumps the handicap gate without a SmarTrip MetroCard; the male private security guard allows the jumper through[59]
6. Another unknown female jumps the handicap gate without a SmarTrip MetroCard; the male private security guard allows the jumper through[60]
7. Another unknown female jumps the handicap gate without a SmarTrip MetroCard; the male private security guard allows the jumper through[61]
8. Another unknown male jumps the handicap gate without a SmarTrip MetroCard; the male private security guard allows the jumper through[62]
9. Another unknown male jumps the handicap gate without a SmarTrip MetroCard; the male private security guard allows the jumper through[63]
10. Exhibit #69: Another unknown female jumps the handicap gate without a SmarTrip MetroCard; the male private security guard allows the jumper through[64]

**Please rereview Table 1/Attachment 1 and Table 2/Attachment 2 for a video breakdown of the listed events for the "Factual Background".**

**Table 1:** "Roberts' BWC", is a breakdown of the minutes and seconds involved in each episode between MTPD Officer Roberts, MTPD Officer G. Hall, and Ms. Taylor for the initial police contact and conversation of this event through the Use of Force against Ms. Taylor; and, ultimately to the transportation of Ms. Taylor off the crime scene.

**Ex 5 Roberts' BWC**

| Ex 5 Roberts' BWC | Time | Event | Time Elapsed |
|---|---|---|---|
| Exhibit #1 | 09:30.27 | MTPD Officer Roberts' BWC is initiated (No volume) | |
| Exhibit #2 | 09:30.40 | MTPD Officer G. Allan stops child from passing through (No volume) | |

[58] Exhibit #63/Attachment 3
[59] Exhibit #64/Attachment 3
[60] Exhibit #65/Attachment 3
[61] Exhibit #66/Attachment 3
[62] Exhibit #67/Attachment 3
[63] Exhibit #68/Attachment 3
[64] Exhibit #69/Attachment 3

| | | | |
|---|---|---|---|
| Exhibit #3 | 09:30.56 | Citizen enters scene and hands Ms. Taylor metro pass (Volume starts) | |
| Exhibit #4 | 09:31.05 | First contact is made between Ms. Taylor and MTPD Roberts | |
| Exhibit #5 | 09:31.07 | MTPD Officer Roberts double arm pushes Ms. Taylor | 00.02 secs |
| Exhibit #6 | 09:31.12 | MTPD Officer Roberts advises Ms. Taylor she is under arrest | 00.05 secs |
| Exhibit #7 | 09:31.22 | MTPD Officer Roberts has deployed OC spray to the right side of Ms. Taylor's face. | 00.10 secs |
| Exhibit #8 | 09:31.37 | MTPD Officer G. Hall first places hands on Ms. Taylor | 00.15 secs |
| Exhibit #9 | 09:33.26 | MTPD Officer Roberts repeated ordering Ms. Taylor to "put your stomach on the ground"; MTPD Officer G. Hall repeatedly advising Ms. Taylor to "stop resisting";<br>Ms. Taylor breathes heavily and exhibits signs of being heavily maced to the right side of her face. | 01.51 mins |
| Exhibit #10 | 09:34.11 | Both MTPD Officer Roberts and MTPD Officer G. Hall threatens to {we} spray Ms. Tayor again. | 00.45 secs |
| Exhibit #11 | 09:34.52 | MTPD Officer G. Hall asks Ms. Taylor to sit up, and Ms. Taylor starts to comply; MTPD Officer Roberts then attempts to execute an armbar hold to bring Ms. Taylor's left arm behind her back. Ms. Taylor exhibits signs of pain. | **00.41 secs** |
| Exhibit #12 | 09:35.32 | Both MTPD Officer G. Hall and MTPD Roberts repeatedly ask Ms. Taylor to sit up; Ms. Taylor starts to sit up, and MTPD Officer Roberts applies a handcuff hold raising Ms. Taylor, inflicting pain on Ms. Taylor. | **00.40 secs** |
| Exhibit #13 | 09:35.47 | MTPD Officer G. Hall keeps advising Ms. Roberts she's resisting; Ms. Taylor advises MTPD officers she can't see; Ms. Taylor wants to "… can I wipe her face first.". | **00.15 secs** |
| Exhibit #14 | 09:35.56 | MTPD officers will not allow Ms. Taylor to wipe her face because they keep trying to handcuff Ms. Taylor | **00.09 secs** |
| Exhibit #15 | 09:36.06 | Ms. Taylor falls back to the ground | **00.10 secs** |
| Exhibit #16 | 09:36.26 | Ms. Taylor is back on ground being advised that she is resisting; armlock and handcuffed wrist lock applied that involves pain compliance against Ms. Taylor. | **00.20 secs** |
| Exhibit #17 | 09:36.50 | MTPD Officer Roberts **handcuffs** Ms. Taylor; after OC spraying of Ms. Taylor at 09:31.22; Ms. Taylor continues to cough. | **00.24 secs** |
| Exhibit #18 | 09:39.17 | Ms. Taylor advises MTPD officers "… I can't see, I can't breather, my body is burning, and drooling from the mouth | **02.51 mins** |
| Exhibit #19 | 09:39.37 | Ms. Tayor, "… my nose it burns, my eye."; breathing heavily and drooling profusely | **00.20 secs** |
| Exhibit #20 | 09:43.14 | Witness advised she called for ambulance; they didn't call anybody | **03.47 mins** |

| | | | |
|---|---|---|---|
| Exhibit #21 | 09:44.14 | DCFD Engine on the scene | **01.00 min** |
| Exhibit #22 | 09:44.23 | MTPD Officer Roberts cleaning his hands before Ms. Taylor has received medical treatment | **00.09 secs** |
| Exhibit #23 | 09:44.45 | Ms. Taylor, "... I can't breathe, that shit is in my throat | **00.18 secs** |
| Exhibit #24 | 09:45.04 | Ms. Taylor complains to DCFD that her wrist is already broke (???) | **00.19 secs** |
| Exhibit #25 | 09:47.57 | Ms. Taylor receives medical attention to her eye and face by DCFD. | **02.53 mins** |
| Exhibit #26 | 09:49.27 | Ms. Taylor has face being washed off | **01.30 mins** |
| Exhibit #27 | 09:49.40 | Ms. Taylor, "... It's hurting, it's burning like crazy, every time I move it burns ... ." Female MTPD Officer L. Christian assists DCFD in washing off Ms. Taylor's face | **00.13 secs** |
| Exhibit #28 | 09:52.26 | DCFD washing off Ms. Taylor's face | **02.46 mins** |
| Exhibit #29 | 09:52.52 | Ms. Taylor, "... I need some air, I can't breathe...". MTPD Officer L. Christian assisting Ms. Taylor with wiping her face with wet cloth. | **00.26 secs** |
| Exhibit #30 | 09:53.54 | MTPD Transporting Ms. Taylor to hospital | **00.052 secs** |
| | | Total time from initial contact to transporting to hospital | **Total Time 0:22.49 mins** |

**Table 1: "Roberts' BWC"**

**Table 2:** "Congress Heights Metrorail station view of Kiosk View" is a breakdown of the minutes and seconds involved in each episode of the police contact between MTPD Officer Roberts, MTPD Officer G. Hall, and Ms. Taylor for the initial contact and conversation of this event through the Use of Force against Ms. Taylor; and, ultimately to the arrest of Ms. Taylor on the crime scene and WMATA fare evaders.

**Ex 3 Cong_08-23*-2023-0920_hrs_Thursday_August_24_20236012_aea2360.avi**

| "Congress Heights Metrorail station view of Kiosk View" | Time | Event | Time Elapsed |
|---|---|---|---|
| Exhibit #31 | 0:00 | Kiosk view picturing MTPD Officer G. Hall conversing with unknown male; 2 private security guards and the Kiosk attendant are also pictured | |
| Exhibit #32 | 0:00 | Exhibit #32: MTPD Officer Roberts enter Kiosk view, stationed outside of of the SmarTrip MetroCard fare gates | |
| Exhibit #33 | 0:41 | MTPD Officer G. Hall retrieves a MetroCard pass for the unknown male. | |

| | | | |
|---|---|---|---|
| Exhibit #34 | 0:45 | MTPD Officer G. Hall, while using MTPD Officer G. Halls' MetroCard, allows the unknown male to exit through the MetroCard fare gate. | |
| Exhibit #35 | 0:53 | MTPD Officer G. Hall allows unknown male to exit through the MetroCard fare gate, while using MTPD Officer G. Hall's own MetroCard; MTPD Roberts is in a position to observe this event. | |
| Exhibit #36 | 0:58 | The unknown male that was allowed to exit the MetroCard fare gate by MTPD Officer G. Hall, without a SmarTrip MetroCard walks past MTPD Officer Roberts; without being stopped by MTPD Officer Roberts. | |
| Exhibit #37 | 1:03 | Ms. Taylor and her 11-year-old son enter the Kiosk view | |
| Exhibit #38 | 1:10 | Ms. Taylor and her 11-year-old son hug each other goodbye, as the 11-year-old son prepares to enter the MetroCard fare gate; MTPD Officer Roberts and MTPD Officer G. Hall look on as the pair hug. | |
| Exhibit #39 | 1:15 | Ms. Taylor's 11-year-old son, holding a lunch bag and notebook, attempts to enter the Metrorail station at the handicap gate entrance without a SmarTrip MetroCard, as Ms. Taylor, MTPD Officer Roberts, MTPD Officer G. Hall, and a female private security guard look on; the handicap gate is locked. | |
| Exhibit #40 | 1:17 | MTPD Officer Roberts makes a police officer contact with Ms. Taylor and engages in a conversation with Ms. Taylor without initiating his BWC; MTPD Officer G. Hall and the female private security guard approach the handicap gate entrance. | |
| Exhibit #41 | 1:23 | MTPD Officer Roberts steps closer to Ms. Taylor, while conducting the police contact and conversation with Ms. Taylor; MTPD Officer G. Hall and the female private security guard approach the handicap gate entrance where the 11-year-old son of Ms. Taylor was standing; everyone appears to be watching the police contact and conversation between MTPD Officer Roberts and Ms. Taylor; MTPD Officer Roberts' BWC has still not been initiated. | |
| Exhibit #42 | 1:28 | Ms. Taylor attempts to open the handicap gate with Ms. Taylor's 11-year-old son in hand; MTPD Officer Roberts, MTPD Officer G. Hall, the female private security guard, and the male private security guard look on; MTPD Officer Roberts steps closer to Ms. Taylor (about 1 meter) and MTPD Officer Roberts' BWC has still not been initiated. | |
| Exhibit #43 | 1:31 | MTPD Officer Roberts steps even closer to Ms. Taylor and continues the police contact and conversation; it is believed that MTPD Officer Roberts' BWC at this point has to have been initiated, without notice to Mas. Taylor; MTPD Officer G. Hall, the female private security guard, and the male private security guard look on. | |
| Exhibit #44 | 1:39 | MTPD Officer Roberts continues the police contact and conversation with Ms. Taylor and both parties are using hand gestures to explain their points of view, as the female private | |

| | | | |
|---|---|---|---|
| | | security officer turns away and walks away from the conversation; MTPD Officer G. Hall continues to look on without intervening MTPDE Officer Roberts' police actions with Ms. Taylor and her 11-year-old son. | |
| Exhibit #45 | 1:43 | MTPD Officer Roberts continues the police contact and conversation with Ms. Taylor and both parties are using hand gestures to explain their points of view; Ms. Taylor directs her 11-year-old son to go through the MetroCard fare gate; MTPD Officer G. Hall attempts to stop the 11-year-old son from gaining entry, and the female private security guard reacts by getting closer to the MetroCard fare gate. | |
| Exhibit #46 | 1:48 | Ms. Taylor and her 11-year-old son step back away from the MetroCard fare gate and away from MTPD Officer Roberts; at NO TIME does Ms. Taylor have her hands cuffed in a threatening manner towards MTPD Officer Roberts; an unknown male WMATA fare rider enters the Kiosk are view from the escalator. | |
| Exhibit #47 | 1:54 | Ms. Taylor continues to have conversation with MTPD Officer Roberts and has her 11-year-old son attempt to gain entry through the MetroCard fare gate, as the unknown male WMATA fare rider enters the event; MTPD Officer G. Hall, the private security guard step away, as the Kiosk attendant exits his Kiosk; Ms. Taylor does not cuff her hands in a threatening manner towards MTPD Officer Roberts; both Ms. Taylor and MTPD Officer Roberts extend the distance between each other. | |
| Exhibit #48 | 1:56 | MTPD Officer Roberts steps 2 meters towards Ms. Taylor, as Ms. Taylor steps back a meter away from the approaching MTPD Officer Roberts; again, Ms. Taylor does not have her haves cuffed in a threatening manner towards MTPD Officer Roberts; the unknown WMATA fare rider is now getting closer to this event, and the unknown WMATA fare rider is retrieving SmarTrip MetroCards | |
| Exhibit #49 | 1:58 | Ms. Taylor, again, steps away from the approaching MTPD Officer Roberts, leaving enough space between her and MTPD Officer Roberts that the unknown WMATA fare rider walks between the two of them and hands Ms. Taylor a SmarTrip MetroCard; MTPD Officer G. Hall, the 2 private security guards, the Kiosk attendant, and another WMATA employee look on. | |
| Exhibit #50 | 2:04 | Ms. Taylor accepts the SmarTrip MetroCard from the unknown WMARTA fare rider and utilizes the SmarTrip MetroCard to have her 11-year-old son enter the MetroCard fare gate; MTPD Officer Roberts closes ground on Ms. Taylor as she is allowing her 11-year-old son to enter the MetroCard fare gate. | |
| Exhibit #51 | 2:06 | After utilizing the SmarTrip MetroCard for her 11-year-old son to gain entry into the MetroCard fare gate, Ms. Taylor enters the MetroCard fare gate area and reaches over the MetroCard fare gate screen to hand the SmarTrip MetroCard to her son; MTPD Officer Roberts continued to close ground and get nearer to Ms. | |

| | | | |
|---|---|---|---|
| | | Taylor's space, while Ms. Taylor was standing inside the MetroCard fare gate entrance. | |
| | 2:06 | THIS EVENT IS OVER – NO NEED FOR FURTHER POLICE ACTION | |
| Exhibit #52 | 2:08 | After MTPD Officer Roberts had closed space on Ms. Taylor, Ms. Taylor turns around after sending her 11-year-old son off to the Metrorail train, with MTPD Officer Roberts standing directly behind Ms. Taylor; contact between Ms. Taylor and MTPD Officer Roberts is very limited, if any, and not a willful contact or touching on Ms. Taylor's part; MTPD Officer G. Hall, the 2 private security guards, the Kiosk attendant, and the other WMATA employee continue look on. | |
| Exhibit #53 | 2:09 | MTPD Officer Roberts applies a 2-hand straight-arm push against Ms. Taylor's right side of her upper body; again, MTPD Officer G. Hall, the 2 private security guards, the Kiosk attendant, and the other WMATA employee continue look on. | |
| Exhibit #54 | 2:11 | After MTPD Officer Roberts applied a 2-hand straight-arm push against Ms. Taylor's right side of her upper body, the force of the 2-hand straight-arm push against Ms. Taylor sends Ms. Taylor to the concrete barrier with a railing (about 3 meters); MTPD Officer Roberts immediately unholsters his department issued mace and advises Ms. Taylor she is under arrest; MTPD Officer G. Hall, the 2 private security guards, the Kiosk attendant, and the other WMATA employee continued look on. | |
| Exhibit #55 | 2:18 | Ms. Taylor resists handcuffing by MTPD Officer Roberts; MTPD Officer G. Hall, the 2 private security guards, the Kiosk attendant, and another WMATA employee continued look on. | |
| Exhibit #56 | 2:24 | Ms. Taylor walks away from MTPD Officer Roberts; MTPD Officer Roberts then deploys his OC spray on Ms. Taylor with 1 burst to the right-side face of Ms. Taylor | |
| Exhibit #57 | 2:30 | Ms. Taylor flees out of the picture view, being followed by MTPD Officer Roberts; MTPD Officer G. Hall walks over to assist MTPD Officer Roberts. | |
| Exhibit #58 | 3:59 | The female private security officer reacts to the secondary contamination from the OC spray odor. | |
| Exhibit #59 | 4:12 | Unknown female WMATA employee reacts to the second-hand mace spray odor with coughing. | |
| Exhibit #60 | 5:57 | The female private security guard allows an adult male to jump the other handicap gate admittance without a SmarTrip MetroCard | |
| Exhibit #61 | 6:34 | An unknown male jumps the handicap gate without a SmarTrip MetroCard; the male private security guard allows the jumper through. | |
| Exhibit #62 | 7:38 | Another unknown male jumps the handicap gate without a SmarTrip MetroCard; the male private security guard allows the jumper through. | |

| | | | |
|---|---|---|---|
| Exhibit #63 | 7:40 | An unknown female jumps the handicap gate without a SmarTrip MetroCard; the male private security guard allows the jumper through. | |
| Exhibit #64 | 8:03 | Another unknown male jumps the handicap gate without a SmarTrip MetroCard; the male private security guard allows the jumper through. | |
| Exhibit #65 | 8:06 | Another unknown female jumps the handicap gate without a SmarTrip MetroCard; the male private security guard allows the jumper through. | |
| Exhibit #66 | 8:20 | Another unknown female jumps the handicap gate without a SmarTrip MetroCard; the male private security guard allows the jumper through. | |
| Exhibit #67 | 8:55 | Another unknown male jumps the handicap gate without a SmarTrip MetroCard; the male private security guard allows the jumper through. | |
| Exhibit #68 | 8:59 | Another unknown male jumps the handicap gate without a SmarTrip MetroCard; the male private security guard allows the jumper through. | |
| Exhibit #69 | 9:03 | Another unknown female jumps the handicap gate without a SmarTrip MetroCard; the male private security guard allows the jumper through. | |

Table 2: "Congress Heights Metrorail station view of Kiosk View"

The Plaintiff was subsequently charged with:

1) Assault on a Police Officer: No Papered

2) Resisting Arrest: No Papered

## EXPERT WITNESS QUALIFICATIONS

I, Trevor R. Hewick, am a court qualified Expert Witness in the State of Maryland Circuit and District Courts, the United States District Court, and the District of Columbia Superior Court of Washington, D.C. I have been qualified as an Expert Witness to give testimony on Use of Force Investigations, Arrest Procedures and Policies, Conducting Criminal Investigations, and Police Department General Orders.

I retired in good standing from the Metropolitan Police Department of Washington, DC as a Detective with twenty-two (22) years of service. I obtained my Master's degree in criminal justice management at the University of Maryland Global Campus (UMGC), and I have a Bachelor's degree in criminal justice through UMGC.

I am a current and active member of the International Association Chiefs of Police, Legal Officers Section (IACP), Police Executive and Research Forum (PERF) member, Fraternal Order of Police, Washington, DC Lodge #1 Active Member and formerly Chairman of their Legislative Committee (FOP #1), a Senior member of the American Society for Industrial Security (ASIS), and a member of the National Defender Investigators Association (NDIA). I have attended training sessions provided by PERF and actively attend the yearly conferences and training sessions of the IACP and the Daigle Law Group (DLG) Use-of-Force conferences and training sessions.

My active criminal defense investigative duties consist of contracts with the State of Maryland Office of the Public Defender and the U.S. District Courts Criminal Justice Act. I am also a contract investigator for the State of Maryland Office of the Attorney General representing Maryland State agencies in civil litigation ranging from wrongful deaths to false arrests litigation. My active civil investigations consist of private litigation cases.

I have been recognized and given testimony as an expert witness for Plaintiffs against law enforcement agencies and law enforcement officers. As a current member of the FOP, I consult and investigate for attorneys hired to represent members of law enforcement, to include but not limited to the

Metropolitan Police Department of Washinton, DC (MPDC), WMATA law enforcement officers, State of Maryland Municipality police departments, and their respective law enforcement officers.

My consultations and investigations address officer-involved shootings, use-of-force matters, wrongful termination claims, and police disciplinary issues arising under labor union contracts. My curriculum vitae (CV) is attached to this report. I reserve the right to revise my opinion if additional materials are provided for review.

REMAINDER OF PAGE INTENTIONALLY LEFT BLANK

**DECISION-MAKING PROCESS for USE-of-FORCE ANAYLSIS**

**I. Objective Reasonableness (Graham v. Connor)**

Was the force objectively reasonable under the Fourth Amendment from the perspective of a reasonable officer on the scene?

**-Severity of the incident:**

MTPD Officer Roberts had placed Ms. Roberts under arrest for Assaulting a Police Officer (APO); an APO incident is a serious criminal offense.

There are mitigating factors to the severity of the incident: Ms. Taylor's actions upon contact, if any, with MTPD Officer Roberts were unintentional and not a willful contact/assault upon MTPD Officer Roberts' person; the contact may have been on the equipment MTPD Officer Roberts was wearing on his vest and not a bodily contact.

Metrorail video of the Kiosk area reveals that Ms. Taylor kept her distance from MTPD Officer Roberts on three separate occasions, during this incident. It was MTPD Officer Roberts that continued to close the space on Ms. Taylor, during this police officer contact.

An unknown WMATA fare rider walked between Ms. Taylor and MTPD Officer Roberts as the police contact and conversation were continuing. As the unknown male handed Ms. Taylor a SmarTrip MetroCard for her son, MTPD Officer Roberts continued to close the space between him and Ms. Taylor. Even when Ms. Taylor escorted her son towards the MetroCard fare gate and reentered the area of the MetroCard fare gate, MTPD Officer Roberts continued to get closer to Ms. Taylor.

This incident was over, so there was no need for MTPD Officer Roberts to continue his police officer contact or to get closer to Ms. Taylor. Ms. Taylor was not a constructive threat to MTPD Officer Roberts once the son entered the secure area of the Metrorail station.

MTPD Officer Roberts' actions are deemed objectively unreasonable. An objectively reasonable officer in the same situation would have ended these police contacts and conversations with Ms. Taylor when the11-year-old student obtained a SmarTrip MetroCard and entered the Metrorail secure area. Closing space and distance on Ms. Taylor was objectively unreasonable during this incident and was not necessary.

The severity of the incident does not reach the threshold of physical contact against MTPD Officer Roberts.

**-Threat to police officers and safety of others:**

After MTPD Officer Roberts forcibly applied a 2-hand straight-arm push on Ms. Taylor, MTPD Officer Roberts advised her she was under arrest. MTPD Officer Roberts retrieved his department issued OC spray and his handcuffs to gain control and custody of Ms. Taylor. Ms. Taylor did not want to be arrested and immediately walked over to MTPD Officer G. Hall.

MTPD Officer G. Hall failed to assist MTPD Officer Roberts in arresting Ms. Taylor and stood by not doing anything. The private security officers also stood by and watched MTPD Officer Roberts attempt to arrest Ms. Taylor. There were other WMATA employees on the scene that were just observing the arrest of Ms. Taylor without intervening in the arrest. WMATA fare riders were not present at the advisement of arrest.

Ms. Taylor was not a physical threat to MTPD Officer Roberts and the safety of others at the initial time of arrest as she sought assistance from MTPD Officer G. Hall, the other private security officer, and the other WMATA employees.

Again, MTPD Officer G. Hall, the two private security officers, and the other WMATA employees did not flee the scene, but only observed the actions of Ms. Taylor and MTPD Officer Roberts.

The threat to police officers and safety to others does not meet the threshold as set forth in a UOF Graham analysis. MTPD Officer Roberts decision-making process in this incident are deemed objectively unreasonable.

**-Actively resisting arrest and evading the arrest:**

Ms. Taylor is actively evading and resisting arrest; although Ms. Taylor believes that the arrest is unlawful, Ms. Taylor cannot and should not evade nor resist the arrest.

Ms. Taylor has many mitigating concerns:

1. Her 11-year-old son had the right to ride the Metrorail without a MetroCard because he was a charter school student,
2. She repeatedly was having conversations about this fare dispute with MTPD Officer Roberts, as others looked on,
3. Once her son obtained a MetroCard from an unknown fare rider, there was no further need for police contact or conversation; the dispute was over,
4. She did not intentionally or willfully assault the officer,
5. MTPD Officer Roberts was standing right behind her when she turned around,
6. MTPD Officer Roberts forcefully assaulted her without any warning,
7. She attempted to seek help from MTPD Officer G. Hall to no avail,

8. No one was listening to her, and she did not wish to get handcuffed,
9. She was eventually OC sprayed in the eye at close range,
10. She was blinded by the OC spray, which caused a burning sensation to her head and body, inhibited her breathing through the mouth and nose,
11. She was taken to the ground on a hard concrete surface and did not want her hands handcuffed behind her back because of her sustained injuries from the OC spraying,
12. Straight-arm lock was applied in attempts to handcuff and applied backwards causing intense pain,
13. Her left wrist was handcuffed, and a handcuffed wrist lock was being applied as the straight-arm lock was being applied causing additional intense pain,
14. She was suffering from severe anxiety and stress from the prolonged struggle, having trouble breathing, could not properly see, and was in additional pain from the force tactics that were applied to her for a forced compliance,
15. She did not want to get in a prone position on the concrete floor because of the OC spray on her face that she wanted to wipe her face, her breathing and burning issues, and the anxiety of being in this pain compliance situation,
16. Every time she attempted to sit up as requested, MTPD Officer Roberts would again apply the handcuffed wrist lock and the straight-arm hold that caused greater pain
17. She needed medical treatment.

MTPD Officer Roberts' tactical decision-making on deploying OC Spray inside an occupied Metrorail station was objectively unreasonable. MTPD Officer Roberts' tactical decision-making to control and gain custody of Ms. Taylor was also objectively unreasonable. MTPD Officer Roberts' actions did not take into consideration the well-being of Ms. Taylor after deploying the OC spray well within the 3 feet distance as stated in Sabre Crossfire Red Dot training.

A reasonable officer in the same circumstances would have obtained assistance from another police officer in order to gain control and custody. A reasonable officer would have attempted de-escalation tactics in talking to Ms. Taylor, to continually assess her behavior, while rendering her medical assistance. A reasonable officer would have utilized a tactical take down on Ms. Taylor with the assist from another officer. A reasonable officer could or would have deployed an Electronic Device Weapon to gain control of Ms. Taylor. A reasonable officer would not have applied pain compliance techniques to a person that was already showing signs of anxiety, distress, and in pain.

Ms. Taylor has shown numerous mitigating factors in explaining her resistance to the arrest. MTPD Officer Roberts's actions and decision-making process were objectively unreasonable in dealing with Ms. Taylor, who was actively resisting arrest.

**II. Totality of Circumstances (Barnes v. Felix 2025)**

Consideration of all relevant circumstances surrounding the use of force – not just the final moment of threat – Including earlier events that give meaning to the officer's decision.

The totality of circumstances that led to this incident are undisputed by video content from the Congress Heights Metrorail station CCTV camera and the BWC of MTPD Officer Roberts. On August 23, 2023, at about 9:30 a.m., the Plaintiff Ms. Taylor escorted her 11-year-old school aged son into the WMATA Congress Heights Metrorail station located at 1290 Alabama Ave SE, Washington, DC 20032.

Ms. Taylor took her son into the Metrorail station and prepared to watch her son enter into the secure Metrorail station through the handicap gate and board the Metrorail train without a school SmarTrip MetroCard.

At that time, WMATA and the DC Department of Transportation were set to implement a program known as "Kids Ride Free" for children going to school. The "Kids Ride Free" program allowed elementary or secondary students to ride on Metrorail free of charge.

The program was set to begin on the same day that District of Columbia Public Schools began school, August 28, 2023. Ms. Taylor's son, however, attended a charter school, which was to begin on the day of this event, August 23, 2023.

But, one minute and three seconds **prior** to Ms. Taylor escorting her son into the WMATA Congress Heights Metrorail station, MTPD Officer G. Hall, along with 2 private security officers, were stationed inside of the secured SmarTrip MetroCard fare gates of the Metrorail station. MTPD G. Hall is conversing with an unknown male in the presence of the 2 private security guards and the Kiosk attendant. MTPD Officer G. Hall, while using his SmarTrip MetroCard, allows the unknown male to exit through the MetroCard fare gate without the unknown male paying the required fare. MTPD Officer Roberts is pictured in this event and was stationed outside of the SmarTrip MetroCard fare gates of the Congress Heights Metrorail station as the unknown male fare evader was allowed to exit the Metrorail station.

Ms. Taylor's son attempted to enter the secure Metrorail station through the handicap gate. The handicap gate is alongside the Kiosk of the Metrorail station, which was occupied by a WMATA employee. The handicap gate was locked, and Ms. Taylor's son could not gain entry to the secure Metrorail station. An unknown female private security guard walked over to the locked handicap gate

where Ms. Taylor's son was attempting to gain entry but stopped short of the locked handicap gate when MTPD Officer Roberts engaged Ms. Taylor in a police contact and conversation.

**This incident should have ended at this point if the female private security guard would have been allowed to let Ms. Taylor's son enter the Metrorail station as a school fare student.**

It is unknown what the true and accurate conversation of the police officer contact was between Ms. Taylor and MTPD Officer Roberts because MTPD Officer Roberts failed to activate his BWC, during the initial police officer contact and conversation with Ms. Taylor.

**MTPD Officer Roberts violated his own MTPD General Orders when he failed to activate his BWC during this police contact with Ms. Taylor.**

From the later audio of MTPD Officer Roberts' BWC, it is believed that the police officer contact and conversation with Ms. Taylor involved Ms. Taylor's son not being allowed to gain entry into the secure Metrorail station without a SmarTrip MetroCard. MTPD Officer G. Hall and the 2 unknown private security officers stood in the secure area of the Metrorail station, as MTPD Officer Roberts conducted this police officer contact and conversation with Ms. Taylor.

During MTPD Officer Roberts police officer contact and conversation with Ms. Taylor, Ms. Taylor attempted to have her son enter the secured Metrorail station through a SmarTrip MetroCard fare gate in full view of MTPD Officer Roberts, MTPD Officer G. Hall and the 2 private security guards, without a SmarTrip MetroCard. MTPD Officer G. Hall stops Ms. Taylor's son from entering the MetroCard fare gate.

MTPD Officer Roberts walks closer to Ms. Taylor and continues the police officer contact and conversation with Ms. Taylor. Ms. Taylor steps back away from MTPD Officer Roberts and advises her son to attempt to gain entry again, through the MetroCard fare gate. MTPD Officer Roberts closes in on Ms. Taylor by 2 meters and continues the police officer contact and conversation with Ms. Taylor. The son was not able to gain entry.

An unknown male WMATA fare rider enters the police officer contact scene with 2 SmarTrip MetroCard in hand. This unknown male WMATA fare rider walks between MTPD Officer Roberts and Ms. Taylor and begins to hand Ms. Taylor a SmarTrip MetroCard for her son, and the **volume starts** on MTPD Officer Roberts' BWC.

Ms. Taylor accepts the SmarTrip MetroCard from the unknown male WMATA fare rider and utilizes the SmarTrip MetroCard to have her 11-year-old son enter the MetroCard fare gate. MTPD Officer Roberts closes ground on Ms. Taylor as she is allowing her son to enter the MetroCard fare gate. After utilizing the SmarTrip MetroCard for her 11-year-old son to gain entry into the MetroCard fare gate, Ms. Taylor enters the MetroCard fare gate area and reaches over the MetroCard fare gate screen to hand the SmarTrip MetroCard to her son. MTPD Officer Roberts continued to close ground behind Ms.

Taylor and get closer to Ms. Taylor's space, while Ms. Taylor was standing inside the MetroCard fare gate entrance. Ms. Taylor's son enters the Metrorail station to the Metrorail train platform and gets off to school.

**The initial reason for the police officer contact and conversation with Ms. Taylor is over and there is no need for any further police action.**

After MTPD Officer Roberts had closed space from behind on Ms. Taylor's space, Ms. Taylor turns around after sending her 11-year-old son off to the Metrorail train platform. MTPD Officer Roberts was standing right behind Ms. Taylor. As Ms. Taylor turns around from the MetroCard fare gate entrance area, there is contact between Ms. Taylor and MTPD Officer Roberts that is very limited, if any. This is not an intentional or willful contact or touching on Ms. Taylor's part. If there was any contact, it was towards the equipment MTPD Officer Roberts was wearing on his armor vest.

**It is unknown why MTPD Officer Roberts continued to close distance on Ms. Taylor on at least 3 different stages of this police officer contact. When Ms. Taylor was repeatedly keeping distance away from MTPD Officer Roberts.**

After the alleged contact, MTPD Officer Roberts applies a 2-hand straight-arm push against Ms. Taylor's right side of her upper body that sends Ms. Taylor to the concrete barrier with a railing. MTPD Officer G. Hall, the 2 private security guards, the Kiosk attendant, and the other WMATA employee continued look on.

MTPD Officer Roberts immediately unholsters his department issued OC Spray and advises Ms. Taylor she is under arrest. MTPD Officer G. Hall, the 2 private security guards, the Kiosk attendant, and the other WMATA employee continued to look on.

Ms. Taylor has now retreated to MTPD Officer G. Hall and has a conversation with MTPD Officer G. Hall who was standing behind the handicap gate entrance.

**MTPD Officer G. Hall had a duty to intervene, and he failed to do so.**

Ms. Taylor resists arrest and handcuffing by MTPD Officer Roberts. MTPD Officer G. Hall, the 2 private security guards, the Kiosk attendant, and another WMATA employee continued to look on. Ms. Taylor walks away from MTPD Officer Roberts towards the escalators of the Metrorail station, when MTPD Officer Roberts deploys his OC Spray towards Ms. Taylor with 1 burst to the right-side face of Ms. Taylor. Ms. Taylor then flees out of the video picture view, being followed by MTPD Officer Roberts. MTPD Officer G. Hall walks over to assist MTPD Officer Roberts.

MTPD Officer G. Hall first places hands on Ms. Taylor at the base of the escalators. Ms. Taylor is taken to the ground by MTPD Officer Roberts and MTPD Officer G. Hall in an attempt to handcuff Ms. Taylor. After taking Ms. Taylor to the hard-surfaced concrete floor at the base of an escalator, MTPD Officer Roberts repeatedly orders Ms. Taylor to "… put your stomach on the ground". MTPD

Officer G. Hall repeatedly advises Ms. Taylor to "stop resisting". Ms. Taylor is breathing heavily and exhibits signs of being heavily OC sprayed to the right side of her face, right eye, nose, throat, neck, chest, shoulders, arms, and head. Ms. Taylor is exhibiting signs of pain and distress.

Eventually, MTPD Officer Roberts **handcuffs** Ms. Taylor at 09:36.50, after OC spraying of Ms. Taylor at 09:31.22. There were numerous opportunities to handcuff Ms. Taylor earlier, but MTPD Officer Roberts' tactical decision-making was not in accordance with MTPD training and MTPD General Orders.

MTPD Officer Roberts's actions are deemed objectively unreasonable under the Totality of Circumstances analysis.

## CONCLUSION

MTPD Officer Roberts' decision-making responses and actions were objectively unreasonable, and it was not necessary to utilize OC spray during this police contact and arrest of Ms. Taylor inside the Metrorail station. Ms. Taylor was not an imminent threat to MTPD Officer Roberts, nor of any WMATA employees that looked on. Although Ms. Taylor was actively resistant to being arrested and taken into custody, Ms. Taylor had numerous mitigating circumstances after being OC spayed causing her serious injury.

MTPD Officer Roberts' tactical decision-making process in handling this incident was objectively unreasonable. His strong-arm pain compliance tactics were objectively unreasonable. MTPD Officer Roberts did not utilize any de-escalation tactics, and nor did he assess or re-assess the behavior and actions of Ms. Taylor. The lack of de-escalation tactics and assessing the behavior of Ms. Taylor is objectively unreasonable.

The police officer contact with Ms. Taylor and her 11-year-old son was a "Kids Ride Free" school program established by WMATA and the D.C. government. Ms. Taylor's son was dressed appropriately for day 1 of school carrying a notebook and a lunch bag. How innocent this was, as a mother walking her child into the Metrorail station, giving him a hug goodbye, and attempting to send him off to school.

MTPD Officer Roberts with MTPD Officer G. Hall and the other WMATA employees were implicit in allowing WMATA unpaid fare riders to ride the Metrorail, while jumping the handicap gates to gain and exit the Metrorail station, as observed on their own CCTV video camera. And just 1 minute and 9 seconds prior to Ms. Taylor and her son entering the Metrorail station, MTPD Officer G. Hall allows an unpaid fare jumper to exit the Metrorail station. This was an abuse of discretion and authority that is not granted to MTPD Officers.

In my opinion MTPD Officer Roberts violated MTPD General Orders and Training Tactics as it relates to this Use of Force against Ms. Taylor. MTPD Officer Roberts' actions and decision-making processes, and lack thereof, are not in compliance with MTPD General Orders and Training Tactics, which incorporates the "objectively reasonable" standard as held in Graham v. Connor, 490 U.S. 386 (1989).

I also have some serious concerns about MTPD Officer G. Hall's actions as it applies to a duty to intervene in this incident and an obstruction of justice on the part of the MTPD IAD Detective who interviewed and recorded a statement from Ms. Taylor. I am awaiting further discovery material to respond to these very disturbing issues in this incident.

My opinions are held to a reasonable degree of certainty. I reserve the right to revise or supplement my opinion if other discovery information becomes available.

Signature line

10/28/2026
Date

Fees Schedule

The fee schedule for this civil action is as follows:

$200.00 per hour for investigative, reviewing documents, and consulting services;

$240.00 per hour for any deposition testimony;

$300.00 per hour for trial testimony

**Expert Witness Designation and Testimony for Federal District Court in Criminal Litigation**

1. United States District Court Washington, DC: Case #22-CR-275 (CKK)
   United States v. Phillip Dupree, Civil Rights Violation (armed) & Obstruction of Justice.
   (Jury Verdict 1 count Civil Rights Violation (unarmed) / Not Guilty Obstruction of Justice)

2. United States District Court Washington, DC: Case #20-CR-151 (CJN)
   US vs Mark Clark: 2 counts Civil Rights Violations & 3 counts choke holds.
   (Jury Verdict 2 counts CRV / Dismissed 3 counts choke holds)

3. United States District Court Washington, DC: Case #19-CR-251 (RDM)
   US vs Andra Vance: 2 Counts Civil Rights Violations
   (Jury Verdict 1 count CRV / Not Guilty 1 count CRV)

**Expert Witness Designation for Federal District Court in Civil Litigation**

4. United States District Court Washington, DC: Case #18-313 (RBW)
   Anthuan Phu Pham v. Giant of Maryland LLC, et al.: Use of Force (OIS) (Settlement)

5. United States District Court of Maryland (Baltimore): Case #16-2636 (ADC)
   Dalima Palmer vs Michael Kirkland & Ocean City Police Department: Use-of-Force (Settlement)

6. United States District Court of Maryland (Greenbelt): Case #16-CV-03953
   Johana Abregado vs Montgomery County Police Department: Use-of-Force (Settlement)

**Expert Witness Designation with Testimony in State Civil and Criminal Litigation**

7. State of Maryland Baltimore City Circuit Court, Case No. 124046014
   State of Maryland v. Zachary Small: 2nd Degree Assault (2x counts), Reckless Endangerment, Misconduct in Office (Bench trial Not Guilty verdicts both counts)

8. Alcohol Beverage Cannabis Administration (ABCA) Protest Hearing Case No. 23-PRO-00078
   Community Protest Report vs Iraklion, LLC Trading as Iraklion 1412 I Street N.W.
   License Transfer to New Location Class "CN" - License # ABRA-116082 (Denied 2/1)

9. State of Maryland Anne Arundel County Circuit Court: C-02-CV-17-001727
   Kimberly M. Parker vs Rodney Butler & Annapolis City Police Dept.: False Arrest (Jury Verdict)

10. State of Maryland Charles County Circuit Court: Case #16-001143
    James Jackson vs State of Maryland Charles County Sheriff's Office: False Arrest (Jury Verdict)

11. State of Maryland Prince Geoge's County Circuit Court: Case #CT22048X
    State of Maryland vs Jeffrey Harris: Assault, Reckless Endangerment, & 2x Misconduct in Office (Jury Verdict Misconduct in Office / Not Guilty Assault, Reckless Endangerment, & MiO)

**Expert Witness Designation in State Civil Litigation**

12. State of Maryland Montgomery County District Court: Case #060200143302017
    Nnaemeka Okoli v. Mountgomery County PD: Use-of-Force & False Arrest (Settlement)

13. Baltimore City Circuit Court: Case # 1:21-CV-02101
    Ivanhoe v. BPD of Baltimore City, Maryland: Use of Force & False Arrest (Settlement)

14. State of Maryland Montgomery County Circuit Court: Case # C-15-CV-24-004527
    Diallo v. Montgomery County PD, Maryland & Skiba: False Arrest (Dismissed)

15. State of Maryland Montgomery County Circuit Court: Case # C-15-CV-24-002510
    Donohue v. Montgomery County PD, Maryland: False Arrest

**Expert Witness Deposition Testimony**

16. Donohoe v. Carolina Wormuth, et al., Case No. C-15-CV-24-002510 Circuit Court Maryland (Pending)

17. Stanton v. Shoppers Warehouse Corp., et al., Case No. C-16-24-002538 Circuit Court Maryland (Settlement)

18. McInnis & Blaine v. 7-Eleven, Inc., et al., Case No.: 2024-CAB-000903 & 2022-CAB-005683 D.C. Superior Court (Settlement)

19. Palmer v. Kirkland, et al., Case No. 16-CV-02636-ADC US District Court, Baltimore, Maryland (Settlement)